# IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| JOSIAH WOODY, | § | |
| | § | No. 543, 2018 |
| Defendant Below, | § | |
| Appellant, | § | |
| | § | Court Below: Superior Court |
| v. | § | of the State of Delaware |
| | § | |
| STATE OF DELAWARE, | § | |
| | § | Cr. ID No. 1705021877(N) |
| Plaintiff Below, | § | |
| Appellee. | § | |

| | | |
|---|---|---|
| SHANTELL NEWMAN, | § | |
| | § | No. 586, 2018 |
| Defendant Below, | § | |
| Appellant, | § | |
| | § | Court Below: Superior Court |
| v. | § | of the State of Delaware |
| | § | |
| STATE OF DELAWARE, | § | |
| | § | Cr. ID No. 1705021865(N) |
| Plaintiff Below, | § | |
| Appellee. | § | |

Submitted: September 11, 2019
Decided: September 23, 2019

Before **VALIHURA**, **VAUGHN**, and **SEITZ**, Justices.

## <u>ORDER</u>

This 23rd day of September, 2019, having considered the briefs and the record

below,[1] it appears to the Court that:

(1) In 2014, police investigated Shantell Newman for stalking her landlord, Thomas Howard, and the landlord's property manager, Phyllis Brown. The investigation continued through February 2017. On February 7, 2017, Detective Jennifer Escheman of the New Castle County Police Department applied for a warrant to search 430 West 29th Street and listed Josiah Woody and Newman as occupants. In the affidavit of probable cause supporting the warrant, Escheman stated the following:

- On August 22, 2014, Brown, the property manager of 205 Channing Drive in Bear, DE, reported to NCCPD that she had received a call from the property's tenant, Newman. A male on the phone threatened to "kill her," and Newman followed with her own profanity-laced rant. Police confirmed that the number used to call Brown belonged to Newman.
- On September 7, 2014, Brown went to Delaware State Police Troop 2 after she received about fifty phone calls on her cell phone from a blocked number. At the police station, Brown answered a call from the blocked number and recognized Newman's voice, who said "How does it feel to know you and your kids will be dead by the close of business tomorrow."
- On September 7, 2014, while at Troop 2, Brown received phone calls from unknown men soliciting sex. Brown informed police that she suspected Newman. She also viewed Newman's Facebook page and saw a picture of herself (Brown) on the profile page. The photo provided a message that was sexually explicit, solicited sex acts, and advised interested persons to contact Brown by her phone number listed on the page.
- On September 28, 2014, Wilmington Police responded to 408 South Franklin Street for a terroristic threatening complaint made by Howard. Howard told police that Newman posted several messages on Facebook

---

[1] Because both appeals arise from the same trial and share questions of law, we have consolidated them *sua sponte* for decision.

2

about taking Howard's life. Howard printed these posts from September 28, 2014, which include more profanity.

- On October 5, 2014, NCCPD officers responded to 205 Channing Drive for a complaint by Newman against Howard and Brown, who she said had come to her door to ask for rent money which turned into a profanity-laced exchange and inappropriate touching.

- On October 6, 2014, police interviewed Howard and Brown who said they were not at Newman's residence on October 5, 2014. Police then questioned Newman who said that neither Howard nor Brown were at her residence on October 5, 2014.

- On November 6, 2014, Brown reported to police that Newman knocked at her door and, when Brown opened it, began swinging a blade at Brown striking her. Brown reported that Newman also took Brown's purse.

- Newman was incarcerated in Maryland from November 2014 until April 11, 2016.

- On October 9, 2016, Brown and Howard reported to Wilmington Police a burglary that occurred that day at 408 South Franklin Street, a property owned by Howard and managed by Brown. Brown told police that when she unlocked the front door she heard what sounded like people talking inside and saw the living room furniture had been tossed around.

- On October 10, 2016, Brown reported to Wilmington Police a trespass complaint at 408 South Franklin Street. Brown reported that as she entered the property, three unknown suspects fled out of the rear kitchen door.

- On October 17, 2016, Brown reported to police that she was sexually assaulted by three masked individuals while she was checking on the property at 408 South Franklin Street. Brown told officers that the men told her that Newman sent them to kill her and Newman said that "you didn't get it the first time to keep your mouth shut." Brown told officers that one of the men put a handgun to her head and pulled the trigger, but the weapon malfunctioned to the suspect's surprise.

- On January 9, 2017, Escheman learned that Newman was pregnant and provided the Division of Family Services with an address of 430 West 29th Street.

3

- On February 7, 2017, Escheman learned that Newman had been transported by ambulance to St. Francis Hospital for labor and delivery and that she provided 430 West 29th Street as her home address.[2]

(2)     On February 7, 2017, a magistrate authorized the search of 430 West 29th Street. The search warrant sought any documentation and electronic devices, particularly those that can connect to WiFi or access Facebook, used or intended to be used for stalking. Escheman searched the residence on February 8, 2017. During the search, they found recent mail addressed to both Woody and Newman. In the basement of the residence, police found a loaded handgun on top of an air duct that had a filed-off serial number, six rounds of ammunition, and one spent casing. While the serial number was later recovered, due to the age of the gun, database searches did not yield any information about the firearm. Woody's and Newman's DNA matched DNA found on the handgun. Police then arrested Woody and Newman for weapons charges.

(3)     On January 10, 2018, Woody filed a motion to suppress the gun and ammunition for lack of probable cause. The Superior Court denied the motion. At trial during Newman's cross-examination of the State's forensics expert, the expert testified that she could not say how the DNA got on the firearm, whether by direct

---

[2] App. to Opening Br. at A115-18.

4

touching or secondary transfer.[3]  On redirect, the Superior Court overruled Newman's objection and allowed testimony from the expert that the DNA on the firearm was unlikely the result of secondary transfer.

(4)  At the close of trial, Woody and Newman requested a jury instruction to treat a statutory exemption from prohibiting possession of weapons with obliterated serial numbers as an essential element of the crime rather than an affirmative defense.  The Superior Court declined and instructed the jury that the exemption was an affirmative defense.  The jury convicted Woody and Newman of all charges.  Newman then filed a motion for judgment of acquittal based on several arguments, all of which the Superior Court denied.

(5)  On appeal, Woody argues the Superior Court erred in denying the motion to suppress, both Woody and Newman argue the Superior Court erred when it decided that the manufacturing date exemption was an affirmative defense and not an element of the crime, and Newman argues the Superior Court erred in allowing certain expert testimony and denying the motion for judgment of acquittal.

(6)  Woody first argues that the Superior Court erred in denying his motion to suppress because the search warrant lacked probable cause.  He argues that the police obtained the search warrant too long after the 2014 incidents to rely on them

---

[3] Secondary transfer occurs when a person touches an intermediary surface, then the intermediary surface touches the tested surface, leaving the person's transferred DNA despite the person never directly touching the tested surface.

5

to support probable cause, and there was no probable cause to believe that a crime was committed based solely on the 2016 incidents.

(7) This Court reviews the denial of a motion to suppress for an abuse of discretion.[4] To the extent we examine the trial judge's formulation and application of law, we review *de novo*.[5] To the extent the judge's decision is based on factual findings, we review for whether the trial judge abused their discretion in determining whether there was sufficient evidence to support the findings.[6] "Where the facts are not disputed and only a constitutional claim of probable cause is at issue, we will review the Superior Court's application of the law of probable cause *de novo*."[7]

(8) "Under the United States and Delaware Constitutions, 'a search warrant may be issued only upon a showing of probable cause.'"[8] Under the state statutes dictating warrant requirements—11 *Del. C.* §§ 2306-07—we have "consistently held that Sections 2306 and 2307 contemplate a 'four-corners' test for probable cause."[9] The four-corners' test requires that the affidavit supporting a search warrant contain facts adequate for a neutral judicial officer to form a reasonable belief that an offense has been committed and that seizable property would be found in a particular place

---

[4] *Lopez-Vazquez v. State*, 956 A.2d 1280, 1284-85 (Del. 2008).
[5] *Id.*
[6] *Id.*; *Downs v. State*, 570 A.2d 1142, 1144 (Del. 1990).
[7] *Sisson v. State*, 903 A.2d 288, 296 (Del. 2006).
[8] *Sisson*, 903 A.2d at 296 (quoting *Fink v. State*, 817 A.2d 781, 786 (Del. 2003)); U.S. Const. Amend. IV; Del. Const. art. 1, § 6.
[9] *Dorsey v. State*, 761 A.2d 807, 811 (Del. 2000).

6

or on a particular person.[10] Whether there are adequate facts in the warrant application requires a logical nexus between the items being sought and the location to be searched.[11]

(9) To decide whether probable cause exists, the court applies a totality of the circumstances test, favoring a commonsense interpretation over a hyper technical one.[12] "Thus, a magistrate may find probable cause when, considering the totality of the circumstances, 'there is a fair probability that contraband or evidence of a crime will be found in a particular place.'"[13] Additionally, a magistrate may draw "reasonable inferences from the factual allegations in the affidavit."[14]

(10) Here, the crime contemplated by the search warrant is stalking. Under 11 *Del. C.* § 1312, "[a] person is guilty of stalking when the person knowingly engages in a course of conduct directed at a specific person." The statute defines "course of conduct" to mean "3 or more separate incidents . . . in which the person directly, indirectly, or through third parties . . . follows, monitors, observes, surveys,

---

[10] *Id.*

[11] *Jones v. State*, 28 A.3d 1046, 1057 (Del. 2011). The State argues that any appeal under the logical nexus requirement was waived, while Woody argues that the right was preserved by "couch[ing] [the argument] as a staleness concern." Answering Br. to Woody at 22-23; Woody's Reply Br. at 3. Because probable cause requires a logical nexus, we will not apply plain error review.

[12] *Sisson*, 903 A.2d at 296; *Jones*, 28 A.3d at 1057.

[13] *Sisson*, 903 A.2d at 296 (citations omitted); *see also Dorsey*, 761 A.2d at 811 ("Probable cause . . . exists if the affidavit sets forth facts that would permit an impartial judicial officer to reasonably conclude that the items sought would be found in those locations.").

[14] *Sisson*, 903 A.2d at 296.

threatens, or communicates to or about another."[15]  Stalking is a felony of either class G, F, or C dependent on the particular facts.[16]  The applicable statute of limitations requires the prosecution to commence within 5 years after it is committed.[17]

(11)   Woody argues that the 2014 incidents are too remote to qualify as an incident under the definition of "course of conduct."   But, the Superior Court concluded correctly that there is no law besides the statute of limitations that limits the timeframe on the course of conduct within which stalking can be committed. Thus, because five years had not passed since the 2014 incidents, the 2014 incidents were properly included in the course of conduct necessary for a stalking offense.

(12)   Woody does not dispute Newman's involvement in the 2014 incidents, and they alone are likely to give rise to a stalking allegation.  Also, at least one of the 2016 incidents may be reasonably inferred to be attributed to Newman because of the masked man's reference to her.  The delay between events can be reasonably attributed to Newman's incarceration.[18]  Such factual allegations in the affidavit support a reasonable belief that a stalking offense had been committed.

(13)   The search warrant sought electronic items related to the 2014 incidents conducted by phone calls and social network postings and other incriminating

---

[15] 11 *Del. C.* § 1312(e)(1).
[16] 11 *Del. C.* § 1312(b)-(d).
[17] 11 *Del. C.* § 205.
[18] As noted earlier, Newman was incarcerated in Maryland from November 2014 until April 11, 2016.

evidence related to the stalking offense which could be available on such devices. The search warrant identified Newman's current home based on her informing the Division of Family Services and the hospital of her address.

(14) Woody argues that it is unreasonable to expect such devices to be in the searched residence because Newman had moved since the 2014 incidents. This is not, however, determinative of whether the items sought, like the electronics here, are fairly probable to be found at the property to be searched. There is a fair probability of discovery if there is a logical nexus between the items sought and place to be searched. Personal electronics are generally valuable and held closely, making it fairly probable, even if not certain, that they are kept in a personal and safe location like one's home. Thus, because there is a reasonable belief that an offense has been committed and that seizable property would be found in the property to be searched, the affidavit contains probable cause within its four corners.

(15) Woody argues next that the four-month delay between the events in October 2016 and the search warrant application in February 2017 makes the information too stale to support probable cause at the time the search warrant was issued. "Probable cause must be based on current information, not conjecture, for stale information will not support a finding of probable cause."[19] There must be

---

[19] *Sisson*, 903 A.2d at 297 (quoting *Pierson v. State*, 338 A.2d 571, 573 (Del. 1975)).

probable cause that the specified items "are *presently* on the premises." [20] Magistrates and courts must consider factors like the "kind of property for which authority to search is sought," "whether the evidence sought is highly incriminating or consumable and thus less or more likely to remain in one location," and the "statements of dates and times."[21]

(16) The Superior Court considered whether the nature of the objects made it reasonable to think that Newman would still be in possession of them. The devices in question—electronic devices such as cellphones and computers—are the type of things that someone would likely continue to maintain.[22] This evidence is not easily consumable, as deleted data can often be recovered by forensics and may be stored by a third-party. Considering the nature of the evidence sought, the four-month delay in obtaining the warrant is not sufficient to show a lack of probable cause.

(17) Woody and Newman both argue that the Superior Court erred when it decided that 11 *Del. C.* § 1459(b) was an affirmative defense to be proved by the defendant by a preponderance of the evidence rather than an essential element to be

---

[20] *Id.* (emphasis in original).
[21] *Id.*; *see State v. Pulgini*, 374 A.2d 822, 823 (Del. 1977) (finding that when the affidavit's facts indicate a course of conduct, rather than an isolated incident, the passage of time becomes less significant).
[22] Additionally, the devices may not need to be the same unique devices that originally created the evidence sought. Such evidence may be stored on third-party sources, like Facebook or a cloud storage service, and be present on a subsequent device owned by the same user.

10

proved by the prosecution beyond a reasonable doubt. We review questions of statutory interpretation *de novo*.[23]

(18)   11 *Del. C.* § 1459 provides, in pertinent part, that:

    (a)    No person shall knowingly transport, ship, possess or receive any firearm with the knowledge that the importer's or manufacturer's serial number has been removed, obliterated or altered in a manner that has disguised or concealed the identity or origin of the firearm.

    (b)    This section shall not apply to a firearm manufactured prior to 1973.

(19)   11 *Del. C.* § 305 is also relevant:

[w]hen this Criminal Code or another statute specifically exempts a person or activity from the scope of its application and the defendant contends that the defendant is legally entitled to be exempted thereby, the burden is on the defendant to prove, as an affirmative defense, facts necessary to bring the defendant within the exemption.

(20)   Section 305 applies here. The plain meaning of § 305 requires that if the Criminal Code "specifically exempts a person or activity from the scope of its application," it is an affirmative defense. In this instance, § 1459(b) is a section of the Criminal Code that specifically exempts an activity from the scope of § 1159(a). The activity exempted is the possession of a firearm with the knowledge that the serial number has been removed, obliterated, or altered and the firearm is manufactured prior to 1973. Without the exemption, the activity would be criminal

---

[23] *Freeman v. X-Ray Associates, P.A.*, 3 A.3d 224, 227 (Del. 2010).

under the statute. Thus, § 305 requires the defendant to prove, as an affirmative defense, the facts necessary to bring the defendant within the exemption—here, that the firearm was manufactured before 1973.

(21) Woody and the State look to *Lively v. State* to support their respective arguments.[24] In *Lively*, this Court placed the burden on the defendant to establish that he had a license to carry a concealed deadly weapon.[25] This Court found that the rule was based on the practical consideration that possession of a license was best viewed as an affirmative defense because the existence of a license to carry was a matter more immediately within the knowledge of the defendant and more readily proven by him.[26] Absent contrary legislative intent, the court construed the statute consistently with the "time-honored rule."[27]

(22) Here, there is no applicable time-honored rule regarding possession of a firearm without its serial number. Additionally, the practical considerations are different because another element of the crime—the serial number having been removed, obliterated, or altered—often makes determination of the manufacture date more difficult or impossible. Thus, *Lively* does not control—section 305 does. The legislature contemplated the manufacture date when considering the application of

---

[24] 427 A.2d 882 (Del. 1981).
[25] *Id.* at 884.
[26] *Id.*
[27] *Id.*

12

the crime. Instead of including it as an element in § 1459(a), it was separated into an exemption clause. Section 305 controls such an exemption clause.

(23) Newman argues that under 11 *Del. C.* § 304, a statute must declare an affirmative defense for one to arise, and § 1459(b) does not expressly declare itself as one. But, this Court has held that § 304 "does not provide that it is exhaustive of all affirmative defenses." Rather, it merely states the burden of proof when there is an affirmative defense.[28]

(24) In the alternative, Woody argues that the defense should be considered a simple defense rather than an affirmative defense. Woody joined in Newman's original argument that the exemption be an element rather than a defense. Woody did not, however, join in Newman's alternative argument that it should be a simple defense.[29] Because Woody did not raise the issue below and Newman does not raise it on appeal, we review for plain error.[30]

(25) Plain error review requires the error complained of be "so clearly prejudicial to substantial rights as to jeopardize the fairness and integrity of the trial process," and the error must be "basic, serious and fundamental . . . and clearly

---

[28] *Bryson v. State*, 840 A.2d 631, 636 (Del. 2003).
[29] App. to Woody's Opening Br. at A328 (Woody joins in Newman's position on the "additional elements as far as the 1973." But, at that time, no argument regarding a simple defense had been raised.); *id*. at A396-402 (Newman raises the simple defense as a new argument for the first time. After argument, the court asks Woody's attorney for any comment, to which he responds "No, Your Honor.").
[30] Sup. Ct. R. 8.

13

deprive an accused of a substantial right, or which clearly show manifest injustice."[31]

Because § 305 controls and § 1459(b) is an affirmative defense, the Superior Court did not plainly err.

(26)  Next, Newman argues that the Superior Court abused its discretion in allowing an expert to testify that the test results were unlikely the result of secondary transfer.  Newman claims that such testimony was not disclosed before trial and was conjecture not based on any scientifically acceptable and reliable basis.

(27)  "We review a Superior Court's decision adjudicating discovery violations for abuse of discretion."[32]  We review an evidentiary ruling allowing expert testimony for abuse of discretion.[33]  If the Superior Court abused its discretion, then we must determine "whether the mistake constituted significant prejudice so as to have denied the appellant a fair trial."[34]

(28)  Upon request, the State must disclose the identity of any expert witness and the substance of the opinions to be expressed.  Here, the State disclosed that it intended to call a forensic DNA analyst, Bethany Kleiser, as an expert witness to testify "consistent with the reports, opinions, and conclusions" of her analysis.[35]

[31] *Small v. State*, 51 A.3d 452, 456 (Del. 2012) (quoting *Wainwright v. State*, 504 A.2d 1096, 1100 (Del. 1986)).
[32] *Taylor v. State*, 982 A.2d 279, 280 (Del. 2008).
[33] *Hamilton v. State*, 82 A.3d, 723 (Del. 2013).
[34] *Barrow v. Abamowicz*, 931 A.2d 424, 429 (Del. 2007) (quotations omitted) (citations omitted).
[35] App. to Answering Br. to Newman at B-5.

Without objection on direct examination, Kleiser testified that she "would expect to see a probably very low-level sample" resulting from secondary transfer, but she "did not have low-level mixtures" in this case.[36] On cross-examination, Newman solicited testimony that Kleiser could not definitively conclude whether direct or secondary transfer caused the DNA to be on the firearm. On redirect, Newman objected to Kleiser's statement that she thought secondary transfer was "unlikely" because of the "great result."[37]

(29) The Superior Court determined that Kleiser had already testified in general terms on direct and that neither direct nor redirect testimony were outside the scope of disclosure because Kleiser's opinion testimony included the results, and the results included the likelihood of secondary transfer. On cross-examination, Newman solicited testimony about Kleiser's opinion whether the DNA results were from direct or secondary transfer. The redirect addressed the same issue: the likelihood of the DNA results being from secondary transfer. The Superior Court did not abuse its discretion in allowing the redirect testimony on the issue raised during cross-examination.

(30) Newman's argument that the opinion was not based on scientific analysis or principles lacks support in the brief and the facts. Newman did not object

---

[36] App. to Newman's Opening Br. at A061.
[37] *Id.* at A069.

15

to Kleiser's testimony about studies on secondary transfer[38] or introduce alternative evidence. The Superior Court did not abuse its discretion in concluding it was based on scientific principles.

(31) Newman also argues that the Superior Court erred in denying her motion for judgment of acquittal. "We review '*de novo* a trial judge's denial of a criminal defendant's Motion for Judgment of Acquittal to determine whether any rational trier of fact, viewing the evidence in the light most favorable to the State, could have found the essential elements of the crimes charged beyond a reasonable doubt.'"[39]

(32) First, Newman argues that the State failed to prove beyond a reasonable doubt that the firearm was manufactured during or after 1973. But, as discussed above, the State did not have to prove the manufacturing date because 11 *Del. C.* § 305 makes the manufacturing date exemption an affirmative defense.

(33) Second, Newman argues that the record evidence satisfies her burden to prove an affirmative defense. Newman did not make this argument in the original motion,[40] thus we apply plain error review.[41] The parties agree that the precise manufacturing date remains unknown. While there is some evidence in Newman's

---

[38] *See* App. to Newman's Opening Br. at A061.

[39] *Elmore v. State*, 115 A.3d 1214, 2015 WL 3613557, at *2 (Del. June 9, 2015) (quoting *White v. State*, 906 A.2d 82, 85 (Del. 2011) (emphasis removed)) (TABLE).

[40] App. to Newman's Opening Br. at A108-14.

[41] Sup. Ct. R. 8.

favor, the Court must view the evidence in light most favorable to the State when considering a motion for judgment of acquittal. Thus, a rational jury could have found that the evidence, or lack thereof, did not support the affirmative defense that the firearm was manufactured prior to 1973.

(34) Finally, Newman argues that the State failed to prove beyond a reasonable doubt that the weapon had been defaced at the time Newman touched or handled the gun and that Newman was aware of the filed-off serial number. Newman did not address the substance of this argument in the briefing.[42] Without briefing on the merits, the arguments are waived.[43]

NOW, THEREFORE IT IS ORDERED that the judgment of the Superior Court is AFFIRMED.

BY THE COURT:

*/s/ Collins J. Seitz, Jr.*
Justice

---

[42] Newman's Opening Br. at 14-15; *see* Newman's Reply Br. (argument omitted).
[43] Sup. Ct. R. 14(b)(vi)(A)(3).