**Marcellous JONES, Defendant Below, Appellant,**

v.

**STATE of Delaware, Plaintiff Below, Appellee.**

**Nos. 16, 2010, 17, 2010.**

Supreme Court of Delaware.

Submitted: June 15, 2011.
Decided: Sept. 2, 2011.

---

Thomas A. Foley, Wilmington, Delaware, for appellant.

Gregory E. Smith, Department of Justice, Wilmington, Delaware, for appellee.

Before STEELE, Chief Justice, HOLLAND, JACOBS, RIDGELY Justices and NOBLE, Vice Chancellor * constituting the Court en banc.

STEELE, Chief Justice:

The police arrested Marcellous Jones at a private party in Newark, Delaware for drug related offenses. Based on evidence seized on the night of Jones's arrest, a magistrate issued a warrant to search his home. Executing this warrant, police discovered drugs and firearms in Jones's residence. Jones attempted to suppress all the items seized as fruit of an illegal seizure and invalid search warrant. A Superior Court judge denied Jones's motions to suppress, rejecting both arguments. After a trial at which the items seized from his residence were not in issue, a jury convicted Jones of drug crimes committed on the evening of his arrest. After a separately stipulated trial, a judge convicted Jones of additional drug and firearm offenses relating to the items seized from his home. Jones appeals both convictions, contending that the Superior Court judge erred by denying his motions to suppress. In this opinion, we consider Jones's appeals together. Because the police illegally seized Jones when they obtained the drugs leading to his initial arrest, the evidence against him, including evidence seized from Jones's home, constitutes inadmissible fruit of the poisonous tree. We accordingly **REVERSE**.

## I. FACTS AND PROCEDURAL HISTORY

On the evening of March 13, 2009, Cheryl Hollingsworth held a private party at the Plumber and Pipefitter's Banquet Facility in Newark to celebrate the release of a DVD her son had produced. Hollingsworth arranged for volunteers from the Thunderguards Motorcycle Club, including Appellant Marcellous Jones, to provide security at the event. Although Hollingsworth did not pay the Thunderguards, she contemplated making a donation to their local chapter.

Late that evening, Delaware State Police Corporal Chris Popp responded to the banquet hall because "a group of individuals [was] providing security for either a dance or some type of CD release party, and it was believed that these individuals did not possess a security license to provide or act as a security agency." When Popp arrived, several Thunderguards were already outside talking with other police officers. Popp overheard his colleague, Lieutenant Ford, explaining that, "[w]e are just here to check security status."

Popp and a Lieutenant Sapp then entered the vestibule of the banquet facility. Popp knew which persons were providing security because they were standing at the doorway checking guests as they arrived, and they were wearing the Thunderguards jackets and clothing. Sapp identified these persons, including Jones, and asked them, "[c]ould you step outside so we [can] obtain information to inquire on security status?" All of the Thunderguards—including Jones—complied with Sapp's request.

Outside the banquet facility, approximately ten police officers congregated in the driveway in a semicircle formation surrounding the front entrance of the building. About twelve to fifteen Thunderguards were standing on the sidewalk adjacent to that driveway. Popp acknowledged that, "[t]he members of this security detail were surrounded by law enforcement on three sides, and directly behind them was the building." The police were

* Sitting by designation pursuant to Del. Const. Art. IV, Sec. 12.

"obtaining and documenting [the Thunderguards'] information."

Delaware State Police Detective Dudzinski then asked Jones for his identification. Jones replied, "I already provided it to somebody else." Jones then "made his way back to [a] little garden area next to the corner of the building behind everybody else." Probation Officer Mark Lewis was standing near Jones and "heard something, a sound like something hit the ground." Lewis observed what he believed to be a package of illegal drugs on the ground. The package contained 24 grams of cocaine in 22 separate baggies. Popp then heard Lewis inquire, "[d]oes anybody want this [c]ocaine that Mr. Jones dropped." Police arrested Jones, and the search incident to the arrest yielded 40 Oxycodone pills and $2,951 in cash.

As a result of this arrest and the discovery of drugs, on March 24, 2009 the police obtained a warrant to search Jones's home at 1003 Liberty Road in Wilmington. The search warrant application identified the evidence seized at the banquet hall, as well as Popp's opinion that the packaging of the drugs and presence of a large sum of cash indicated a drug dealing operation. The affidavit supporting the search warrant application also detailed the history of drug activity at Jones's home by his brother and nephew who were at that time incarcerated on drug charges. Pursuant to the search warrant, the police searched Jones's residence and discovered more cocaine and two firearms with obliterated serial numbers. Police arrested Jones again on March 27, 2009.

On April 13, 2009, a New Castle County grand jury indicted Jones for various crimes arising out of the events of March 13, 2009, including trafficking in cocaine (10–50 grams), possession with intent to deliver cocaine, possession of cocaine, and possession of drug paraphernalia. On June 22, 2009, Jones filed a motion to suppress the evidence seized at the banquet hall. A Superior Court judge held an evidentiary hearing on the motion to suppress on July 17, 2009, and denied the motion on September 11, 2009.[1] Thereafter, the State dropped the drug paraphernalia charge and the Superior Court judge dismissed the charge of possession of cocaine. After a two day trial beginning on September 15, 2009, a jury found Jones guilty of trafficking in cocaine and of possession with intent to deliver.

On April 27, 2009 a grand jury indicted Jones for separate crimes unrelated to the events of March 13, based on the evidence police later seized from his home. These offenses include trafficking in cocaine and other related drug and weapon crimes. On June 1, 2009, Jones moved to suppress the additional drugs and weapons, challenging the "four corners" of the search warrant. The Superior Court judge heard oral argument related to the March 24 search warrant at the same hearing held to consider Jones's previous motion to suppress. Thereafter, the judge denied the motion to suppress the fruits of the search warrant. After a stipulated trial on June 6, 2009, a judge convicted Jones of trafficking in cocaine and possession of a firearm by a person prohibited. On December 11, 2009, a Superior Court judge sentenced Jones to 15 years in prison. Jones appeals all his convictions, arguing that the Superior Court judge erred by denying his motions to suppress.

## II. JONES'S INITIAL ENCOUNTER WITH POLICE

Jones argues that the police illegally seized him when officers asked the Thun-

---

1. *State v. Jones,* Order No. 00903020716, 2009 WL 3338100 (Del.Super.Sept. 11, 2009).

derguards to step outside. Consequently, Jones maintains, the bag of cocaine he discarded, and the evidence found during the ensuing search incident to his arrest, should be suppressed. Jones further contends that he was not subject to administrative seizure under 24 *Del. C.* § 1324 concerning private security agencies because he was not engaged in activity requiring a license under § 1329.

We review the denial of a motion to suppress for abuse of discretion.[2] To the extent the Superior Court judge's decision is based on factual findings, we determine whether the judge abused his discretion by finding sufficient evidence to support his ruling and whether those findings were clearly erroneous.[3] To the extent that we examine the Superior Court judge's legal conclusions, we review them *de novo* for errors in formulating or applying legal precepts.[4]

## A. The police seized Jones because a reasonable person in his position would not have felt free to ignore the police presence.

In *California v. Hodari D.*, the United States Supreme Court articulated the test for whether an encounter with police constitutes a seizure under the Fourth Amendment to United States Constitution.[5] Under the Fourth Amendment, a seizure occurs when an officer applies

force or, where that is absent, the defendant submits to an officer's "show of authority."[6] We considered this test in *Jones v. State*, but adhered to our own precedents, concluding that the question of whether a seizure occurs under article I, section 6 of the Delaware Constitution "requires focusing upon the police officer's actions to determine when a reasonable person would have believed he or she was not free to ignore the police presence."[7] Although we declined to adopt the *Hodari D.* test for interpreting our Constitution, we required that a police officer and a citizen may engage in a consensual encounter that does not amount to a seizure. In *Williams v. State*, we explained:

> Even under this more stringent standard, "law enforcement officers are permitted to initiate contact with citizens on the street for the purpose of asking questions." This type of interaction is an encounter and, if consensual, neither amounts to a seizure nor implicates the Fourth Amendment. During a consensual encounter, a person has no obligation to answer the officer's inquiry and is free to go about his business. Only when the totality of the circumstances demonstrates that the police officer's actions would cause a reasonable person to believe he was not free to ignore the police presence does a consensual encounter become a seizure.[8]

2. *Williams v. State*, 962 A.2d 210, 214 (Del. 2008) (citing *Lopez–Vazquez v. State*, 956 A.2d 1280, 1284 (Del.2008)).

3. *Id.*

4. *Id.*

5. 499 U.S. 621, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991).

6. *Id.* at 625–26, 111 S.Ct. 1547.

7. *Jones v. State*, 745 A.2d 856, 869 (Del.1999). *See also Loper v. State*, 8 A.3d 1169, 1173–74

(Del.2010); *Moore v. State*, 997 A.2d 656, 663–64 (Del.2010); *Williams*, 962 A.2d at 215–16; *Lopez–Vazquez*, 956 A.2d at 1286 n. 6; *Ross v. State*, 925 A.2d 489, 493–94 (Del. 2007); *Harris v. State*, 806 A.2d 119, 124 (Del.2002); *Flonnory v. State*, 805 A.2d 854, 858 (Del.2001); *Woody v. State*, 765 A.2d 1257, 1264 (Del.2001).

8. *Williams*, 962 A.2d at 215–16. *See also Ross*, 925 A.2d at 494 (holding that "the presence of uniformed police officers following a walking pedestrian and requesting to speak

The United States Supreme Court also has distinguished between seizures and consensual encounters. In *Muehler v. Mena*, the Court explained:

We have "held repeatedly that mere police questioning does not constitute a seizure." "[E]ven when officers have no basis for suspecting a particular individual, they may generally ask questions of that individual; *ask to examine the individual's identification;* and request consent to search his or her luggage." [9]

Various factors are relevant to an analysis of the "totality of the circumstances" surrounding a police encounter. The facts of *Williams* are instructive. In that case, a police officer observed the defendant walking along the median of a road in the early morning hours. The officer pulled his car up and activated his strobe light. The police officer asked the defendant for his name and date of birth. The officer also asked the defendant where he was going and whether he needed a ride. The defendant declined the invitation and continued on his way. We explained that "viewing the totality of the circumstances—[the officer]'s inquiry, [the defendant]'s voluntary response to questions, and the amicable end to the encounter—a reasonable person would believe he was free to ignore the police presence." [10]

Case law from other jurisdictions also is instructive. Given the "necessarily imprecise" standard for determining whether an individual has been seized, [11] other courts have developed factors to consider when evaluating whether a police encounter amounts to a seizure. For example, in *United States v. Mendenhall*, the United States Supreme Court explained that four circumstances might indicate a seizure: (1) "the threatening presence of several officers," (2) "the display of a weapon by an officer," (3) "some physical touching of the person of the citizen," or (4) "the use of language or tone of voice indicating that compliance with the officer's request might be compelled." [12]

In *United States v. Scheets*, the Seventh Circuit considered the following six factors in its totality-of-the-circumstances analysis: (1) "whether the encounter occurred in a public or private place," (2) "whether the suspect was informed that he was not under arrest and free to leave," (3) "whether the suspect consented or refused to talk to the investigating officers," (4) "whether the investigating officers removed the suspect to another area," (5) "whether there was physical touching, display of weapons, or other threatening conduct," and (6) "whether the suspect eventually departed the area

with him, without doing anything more, does not constitute a seizure").

9. *Muehler v. Mena*, 544 U.S. 93, 101, 125 S.Ct. 1465, 161 L.Ed.2d 299 (2005) (emphasis added) (citations omitted). *See also Florida v. Bostick*, 501 U.S. 429, 434–35, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991); *Florida v. Rodriguez*, 469 U.S. 1, 5–6, 105 S.Ct. 308, 83 L.Ed.2d 165 (1984); *Florida v. Royer*, 460 U.S. 491, 497–98, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983); *Terry v. Ohio*, 392 U.S. 1, 19 n. 16, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) ("Obviously, not all personal intercourse between policemen and citizens involves "sei-

zures" of persons. Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred.").

10. *Williams*, 962 A.2d at 216.

11. *See Michigan v. Chesternut*, 486 U.S. 567, 573, 108 S.Ct. 1975, 100 L.Ed.2d 565 (1988).

12. *United States v. Mendenhall*, 446 U.S. 544, 554, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980) (citing *Terry*, 392 U.S. at 19 n. 16, 88 S.Ct. 1868).

without hindrance." [13]

■ We adopt the *Scheets* factors here to channel the unavoidable discretion that is part and parcel of our totality of the circumstances inquiry. We also note, however, as did the court in *Scheets,* that analysis of a police encounter should consider "all relevant circumstances," including these six nonexhaustive factors.[14] Courts must not rigidly apply these factors but instead should independently analyze the facts of each case. In applying the totality of the circumstances test, "no one factor is legally determinative, dispositive, or paramount." [15] Normally, "we do not expect courts to merely count the number of factors weighing on one side of the determination or the other" because "a factor may be more indicative of a coercive atmosphere in one case than in another." [16] Nevertheless, giving equal weight to each factor and only those factors, provides needed structure to our totality of the circumstances analysis in a close case such as the one before us.

■ Here, we should give "great weight" [17] to the State's steadfast concession that the police seized Jones.[18] Although the State's "confession of error does not *require* the reversal of [Jones's] convictions," "an independent determination [shows] that a reversible error was committed." [19] In Jones's case, two of the *Scheets* factors favor a determination of a consensual encounter, because Jones was not "*removed* to another area," and "there was [no] physical touching, display of weapons, or other threatening conduct." [20] But, four factors (a majority of the factors identified in *Scheets* ) favor the determination that a seizure occurred, because "the encounter occurred in a ... private place," Jones "was [not] informed that he was not under arrest and free to leave," Jones "refused to talk to [Dudzinski]," and Jones did not "eventually depart[ ] the area without hindrance." [21] These factors when combined with the State's concession, lead us to conclude that the police seized Jones shortly before he dropped the bag of cocaine.

13. *United States v. Scheets,* 188 F.3d 829, 836–37 (7th Cir.1999) (citing *United States v. McCarthur,* 6 F.3d 1270, 1276 (7th Cir.1993)). *See also United States v. Withers,* 972 F.2d 837, 842 (7th Cir.1992) ("The factors we consider in determining whether, in the totality of the circumstances, a reasonable person would believe she were free to leave: whether the encounter occurred in a public or private place; whether the suspect consented or refused to talk to the police; whether the police informed the suspect that she was not under arrest and was free to leave; whether the police removed the suspect to another area; whether the suspect felt capable of refusing to consent to the search; and whether the suspect eventually departs the area without hindrance."); *State v. McGinnis,* 290 Kan. 547, 233 P.3d 246, 252 (2010) (considering a similar set of factors).

14. *Scheets,* 188 F.3d at 836–37.

15. *McGinnis,* 233 P.3d at 253 (quoting *State v. Thompson,* 284 Kan. 763, 166 P.3d 1015, 1020 (2007)).

16. *Id.*

17. *See Young v. United States,* 315 U.S. 257, 258, 62 S.Ct. 510, 86 L.Ed. 832 (1942).

18. *See* State's Answering Brief, at 10 ("Certainly when the police asked Jones and his fellow Thunderguards members to leave the hall and provide them with identification, a reasonable person would not have felt free to simply ignore the police presence."); State's May 12, 2011 Answering Supplemental Memorandum, at 1 ("Outside [the banquet hall], the encounter became less-than-consensual").

19. *See Weddington v. State,* 545 A.2d 607, 612 (Del.1988).

20. *Scheets,* 188 F.3d at 836–37.

21. *Id.*

### B. Police had no reasonable articulable suspicion that a violation of the private security services statute occurred.

 The police could seize Jones only if they had a reasonable articulable suspicion that a civil violation had occurred or was occurring.[22] "Reasonable suspicion is a less demanding standard than probable cause."[23] "It depends on 'the officer's ability to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant th[e] intrusion.'"[24] In determining whether reasonable suspicion exists, we look at the totality of the circumstances, "as viewed through the eyes of a reasonable, trained police officer in the same or similar circumstances, combining objective facts with [the] officer's subjective interpretation of those facts."[25] Popp testified that "it was believed that the[ ] individuals did not possess a security license to provide or act as a security agency." The record, however, does not reflect "specific and articulable facts which, taken together with rational inferences from those facts" support Popp's hunch.[26] In fact, Popp testified, the officers were identifying the persons that night, so that they could *later* verify whether or not they were indeed licensed to provide security.

### C. A valid administrative seizure could not have occurred because Jones and the Thunderguards activity did not require a license under the private security statute.

 Without a reasonable articulable suspicion that Jones violated the private security statute, his seizure was only legal if it was a valid administrative seizure pursuant to *New York v. Burger*.[27] In this case, Jones' and the Thunderguards conduct did not even come within the law's purview. Under § 1329, "No person shall *engage in the business* of a private ... security guard, [or] guard company ... without first obtaining a license."[28] Consequently, to be subject to a valid administrative search or seizure either the Thunderguards or Jones must be "engaged in the business" of private security services. That implies a pattern of business activity beyond a mere one time offering. Being "engaged in the business" of private security requires carrying on a commercial security enterprise for profit.[29] Neither Jones nor the Thunderguards fit this defi-

---

**22.** Title 24, chapter 13 does not impose criminal sanctions for the unauthorized delivery of private security services. Rather, the Delaware Board of Examiners of Private Investigators and Private Security Agencies has the power to impose a civil penalty up to $200 per day, for each violation. 24 *Del. C.* § 1311. *See also Rickards v. State*, 2011 WL 153643, at *1 (Del.2011) (holding that "a police officer [may] stop a driver where the officer has a reasonable and articulable suspicion regarding the commission of a civil traffic violation"). Rickards is arguably distinguishable because title 21, section 801 expressly provides: "Any police officer is authorized to make an administrative stop for purposes of enforcing a civil traffic statute, upon a reasonable and articulable suspicion that a violation of such statute has occurred."

**23.** *Rickards*, at *1 (citing *Illinois v. Wardlow*, 528 U.S. 119, 123, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000)).

**24.** *Id.* (quoting *Coleman v. State*, 562 A.2d 1171, 1174 (Del.1989)).

**25.** *Jones*, 745 A.2d at 861.

**26.** *Id.*

**27.** 482 U.S. 691, 107 S.Ct. 2636, 96 L.Ed.2d 601 (1987).

**28.** 24 *Del. C.* § 1329 (emphasis added).

**29.** If this construction of § 1329 is inconsistent with the legislature's intent, the Delaware General Assembly is of course free to amend the statute to cover the activity.

nition. No one paid Jones for his efforts on the evening of March 13, 2009, nor does the record indicate that Cheryl Hollingsworth's potential donation to the local chapter of the Thunderguards actually induced the group to provide security services at the party. In other words, the record does not demonstrate that the Thunderguards offered their services in consideration of a donation from Hollingsworth. The facts actually lean in the opposite direction toward two separate gratuitous transfers rather than one unified contract. As a result, Jones' and the Thunderguards' actions cannot support an administrative search under § 1329. We accordingly need not proceed to apply or analyze the test for a valid administrative search under *Burger.*

### D. The drugs and other evidence seized on the night of Jones's initial arrest are fruits of the illegal seizure and thus are inadmissible.

■ Since the police illegally seized Jones, any evidence gathered as a result of that seizure must be suppressed as "fruit of the poisonous tree."[30] The traditionally recognized exceptions to this doctrine are limited to "attenuation, inevitable discovery, independent source, or some intervening act or event sufficient to purge the taint of the illegal stop."[31]

The United States Supreme Court has never held that abandonment of evidence in response to unlawful police action (*e.g.,* an illegal seizure) constitutes an exception to the "fruit of the poisonous tree" doctrine. Nor has this Court specifically addressed whether evidence that was abandoned as a result of an illegal seizure must be suppressed. Courts that have addressed this question have concluded that suppression is required if the abandonment was a direct consequence of the illegal seizure.[32] The United States Court of Appeals for the Third Circuit has held that "when the abandonment of property is precipitated by an unlawful seizure, that property also must be excluded."[33] The United States Court of Appeals for the Fifth Circuit has similarly ruled that "[w]hile it is true that a criminal defendant's voluntary abandonment of evidence can remove the taint of an illegal stop or arrest, it is equally true that for this to

**30.** *Wong Sun v. United States,* 371 U.S. 471, 484–85, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

**31.** *United States v. Mosley,* 454 F.3d 249, 269 (3d Cir.2006); *see also Murray v. United States,* 487 U.S. 533, 108 S.Ct. 2529, 101 L.Ed.2d 472 (1988) (noting the "independent source" exception); *Nix v. Williams,* 467 U.S. 431, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984) (discussing the "inevitable discovery" exception); *United States v. Ceccolini,* 435 U.S. 268, 274–75, 98 S.Ct. 1054, 55 L.Ed.2d 268 (1978) (summarizing the legal question in *Wong Sun* to be whether the connection between the lawless conduct of the police and the discovery of the challenged evidence had "become so attenuated as to dissipate the taint." (internal quotation marks and citation omitted)); *Brown v. Illinois,* 422 U.S. 590, 604, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975) (identifying "intervening act" exception).

**32.** These other courts include the United States Court of Appeals for the Third, Fourth, Fifth, Eighth, Ninth, Tenth, and Eleventh circuits, as well as other state courts. *See, e.g., United States v. Coggins,* 986 F.2d 651, 652 (3d Cir.1993); *United States v. Wilson,* 953 F.2d 116, 127 (4th Cir.1991); *United States v. Bailey,* 691 F.2d 1009 (11th Cir.1982); *United States v. Gilman,* 684 F.2d 616, 620 (9th Cir. 1982); *United States v. Barber,* 557 F.2d 628 (8th Cir.1977); *United States v. Newman,* 490 F.2d 993 (10th Cir.1974); *Fletcher v. Wainwright,* 399 F.2d 62 (5th Cir.1968); *Erickson v. State,* 181 P.3d 1117 (Alaska Ct.App.2008); *State v. Oquendo,* 223 Conn. 635, 613 A.2d 1300, 1314 (1992); *State v. Parks,* 977 So.2d 1015 (La.Ct.App.2008); *Commonwealth v. Jeffries,* 454 Pa. 320, 311 A.2d 914, 918 (1973).

**33.** *Coggins,* 986 F.2d at 652.

occur, the abandonment must be truly voluntary and not merely the product of police misconduct."[34] Thus, a defendant does not voluntarily abandon property where the abandonment is in response to, because of, or as a direct result of, the unlawful police conduct.[35] Given this authority, the question regarding Jones's first motion to suppress becomes whether his abandonment of the drugs was a result of the unlawful seizure.

The United States Supreme Court has set forth several factors that are relevant to determining whether a defendant's behavior was a result of illegal police action.[36] Those factors include: "(1) the temporal proximity of the arrest and the defendant's response, (2) the presence or absence of intervening circumstances, and (3) the purpose and flagrancy of the official misconduct."[37] Put another way, there must be a "causal nexus between the unlawful police conduct and [the defendant's] abandonment of his [property]."[38]

All three factors point to a conclusion that the illegal seizure provoked Jones' actions. On the first factor, the record reflects that after Detective Dudzinski asked Jones for his identification, Jones refused and immediately began walking away towards the rear where the other members had been gathered outside.[39] Jones dropped the bag of cocaine in the garden while doing so.[40] As for the second factor, no intervening act or event appears that would have severed the causal connection between when Dudzinski seized Jones and when Jones abandoned the drugs. The trial testimony suggests that nothing else occurred in that short interval of time.[41] Thus, this is not a situation where Jones' response to the illegal stop was "itself a new, distinct crime" that would constitute an intervening act that purged the taint of the unlawful seizure.[42] Finally, nothing in the record suggests that Jones' decision to walk away from Dudzinski and discard the drugs was simply "a mere coincidental decision," or "caused by any-

---

34. *United States v. Beck*, 602 F.2d 726, 729–30 (5th Cir.1979); *see also United States v. Pirolli*, 673 F.2d 1200, 1204 (11th Cir.1982) (same).

35. *See, e.g., Fletcher*, 399 F.2d at 64 (holding that "since the [police's] initial entry was improper and the items were thrown out the window as a direct result of that illegality, the police were not entitled to the fruits."); *Jeffries*, 311 A.2d at 918 (concluding that suppression is warranted when the "causative factor in the abandonment" is the police's unlawful action).

36. *See, e.g., Dunaway v. New York*, 442 U.S. 200, 218, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979); *Brown v. Illinois*, 422 U.S. 590, 603–04, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975).

37. *United States v. Bailey*, 691 F.2d 1009, 1015 (11th Cir.1982) (citing *Dunaway* and *Brown*).

38. *United States v. Roman*, 849 F.2d 920, 923 (5th Cir.1988).

39. Case No. 17, 2010, App'x to App. Open. Br. At A21.

40. *Id.*

41. *Id.*

42. *Bailey*, 691 F.2d at 1017 (holding that if a suspect's response to an illegal stop "is itself a new, distinct crime, then the police constitutionally may arrest the [suspect] for that crime."). In *Bailey*, the suspect had fled from the police after being illegally "seized," and during that flight, pulled out a gun and fired shots at the police. *Id.* at 1018–19; *see also United States v. Castillo*, 238 F.3d 424 (Table), 2000 WL 1800481, at *6 (6th Cir.2000) (concluding that defendant's "high-speed [car] flight from [the police] constituted an intervening act that purged the taint of his detention."); *United States v. Sprinkle*, 106 F.3d 613, 619 n. 4 (4th Cir.1997) (citing cases where there had been an intervening criminal act subsequent to the initial illegal police stop).

thing other than the illegal stop."[43] Thus, the third factor also weighs in favor of concluding that the abandonment was a direct consequence of the illegal seizure. This outcome is consistent with those reached by other courts that have addressed similar facts.[44] Having applied the United States Supreme Court's three factors, we conclude that Jones abandoned the drugs in response to his illegal seizure. The drugs and the fruits of the ensuing arrest should, accordingly, have been suppressed.

## III. THE WARRANT TO SEARCH JONES'S HOME

▇▇▇ Turning to the legality of the search of his home, Jones claims that the four corners of the affidavit in support of the search warrant do not establish probable cause. We agree. A search warrant is constitutionally deficient[45] if it does not "set forth facts adequate for a judicial officer to form a reasonable belief that an offense has been committed and the property to be seized will be found in a particular place."[46]

We review a magistrate's probable cause determination with great deference.[47] Where the parties do not dispute the facts and only a constitutional claim of probable cause is presented, we review the Superior Court's application of the law of probable cause de novo.[48] We review the affidavit supporting the search warrant as a whole and not based on separate, discrete allegations.[49] The affidavit must set forth facts permitting an impartial judicial officer to reasonably conclude that the items sought would be found at the location.[50] The determination of whether the facts in the affidavit demonstrate probable cause requires a logical nexus between the items being sought and the place to be searched.[51]

Here, the search warrant sought to find drugs, paraphernalia, and firearms at Jones's residence. The information in the affidavit falls into three categories: (1) the information relating to Jones's arrest on March 13, 2009; (2) the criminal history at 1003 Liberty Road relating to the other residents, Marcus Jones and Andre Hickson, in 2003 and 2007; and (3) the criminal history at 1003 Liberty Road relating to Jones. As discussed in Part II, supra, the police illegally seized Jones on March 13th and the subsequent fruits of that illegal seizure must be suppressed. As a result, the police could not use the illegally seized evidence in the affidavit to support their application for a search warrant. Delaware has not adopted the "good faith" exception to the exclusionary rule[52] and

---

43. *United States v. Beck*, 602 F.2d 726, 730 (5th Cir.1979); *see also Bailey*, 691 F.2d at 1015 ("We cannot say that [defendant's] flight in the face of and only after his illegal arrest represents a mere coincidental decision to run unrelated to the police conduct; it would be sheer fiction to presume that [defendant's] flight was caused by anything other than the illegal stop." (internal quotation marks, alterations, and citations omitted)).

44. *See supra* note 43 (citing cases); *see also United States v. Jones*, 374 F.Supp.2d 143, 156 (D.D.C.2005) (discussing cases).

45. DEL. CONST. art. I, § 6.

46. *LeGrande v. State*, 947 A.2d 1103, 1107 (Del.2008).

47. *Id.* at 1108 (quoting *Jensen v. State*, 482 A.2d 105, 111 (Del.1984)).

48. *Id.*

49. *Dorsey v. State*, 761 A.2d 807, 811 (Del. 2000).

50. *Id.*

51. *Id.*

52. *Id.* at 820.

continues to require exclusion of evidence obtained in violation of the Delaware Constitution's protection against illegal searches and seizures.[53] Thus, we must exclude from the affidavit the tainted information relating to the March 13th arrest. Even so, tainted allegations in an affidavit "do not vitiate a warrant which is otherwise validly issued upon probable cause reflected in the affidavit."[54] Rather, a reviewing court must "excise the tainted evidence and determine whether the remaining, untainted evidence would provide a neutral magistrate with probable cause to issue [the] warrant."[55]

After excision of the tainted information in the affidavit, this Court has before it the last two categories of information in the affidavit detailing searches and arrests in 2003 and 2007. If the information in the affidavit for a search warrant is stale, it will not support a finding of probable cause.[56]

The criminal history information in the affidavit regarding Marcus Jones and Andre Hickson related to incidents during 2003 and 2007 at 1003 Liberty Road. Importantly, the affidavit also stated that Andre Hickson has been incarcerated in federal prison since 2004 and Marcus Jones has been incarcerated since September 2007.

The criminal history directly relating to Marcus Jones occurred during two searches in May 2003. During one of those searches, the police found a stolen firearm in a bedroom shared by Jones and Hickson. As a result of those searches, the State charged Jones with possession of a firearm by a person prohibited, possession of a firearm with an obliterated serial number, and possession of drug paraphernalia.

Probable cause must be manifest at the time the police seek the search warrant, not at some earlier point in time.[57] Here, all of the information relating to searches and arrests in 2003 was stale. Drugs and weapons charges dating back approximately six years before do not support a factual inference that the police will find contraband at Jones's residence in 2009. Likewise, the 2007 information was stale and could not support a reasonable inference that linked Marcellous Jones to any ongoing criminal conduct. Rather, the 2007 information directly related to Jones's brother, who because of the 2007 search, remained incarcerated. Given the affidavit facts that a magistrate could lawfully consider, under a totality of the circumstances review, it would be unreasonable to conclude that evidence of current criminal activity would be found at Jones's residence.

Therefore, we hold that the search violated Jones's constitutional rights under Article I, Section 6 of the Delaware Constitution and the evidence seized without probable cause should have been suppressed. Accordingly, the Superior Court erred by denying Jones's motion to suppress.

**53.** *Id.* at 814 (explaining a search warrant issued without probable cause violates a defendant's rights under Art. 1 Section 6 of the Delaware Constitution and 11 *Del. C.* §§ 2306 and 2307).

**54.** *United States v. Johnson,* 690 F.2d 60, 63 (3d Cir.1982); *Franks v. Delaware,* 438 U.S. 154, 171–172, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978).

**55.** *United States v. Herrold,* 962 F.2d 1131, 1138 (3d Cir.1992) (quoting *United States v. Vasey,* 834 F.2d 782, 788 (9th Cir.1987)).

**56.** *Jensen v. State,* 482 A.2d 105, 111 (Del. 1984).

**57.** *Id.*

## IV. CONCLUSION

For the forgoing reasons, the judgments of the Superior Court are reversed.