# IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| DAMON ANDERSON, | § | |
| | § | No. 476, 2019 |
| Defendant Below, | § | |
| Appellant, | § | Court Below: Superior Court |
| | § | of the State of Delaware |
| v. | § | |
| | § | Cr. ID No. 1710006710 (N) |
| STATE OF DELAWARE, | § | |
| | § | |
| Plaintiff Below, | § | |
| Appellee. | § | |

Submitted: January 6, 2021
Decided: March 30, 2021

Before **SEITZ**, Chief Justice; **VALIHURA**, and **MONTGOMERY-REEVES**, Justices.

Upon appeal from the Superior Court of the State of Delaware: **AFFIRMED**.

Andrew J. Witherell, Esquire (*argued*), Wilmington, Delaware, *for Defendant Below, Appellant Damon Anderson.*

Andrew J. Vella, Esquire (*argued*), Delaware Department of Justice, Wilmington, Delaware, *for Plaintiff Below, Appellee State of Delaware.*

**SEITZ**, Chief Justice:

A Superior Court jury convicted Damon Anderson of five felonies for his involvement in a Wilmington drug dealing enterprise. The Superior Court declared Anderson an habitual offender and sentenced him to an aggregate thirty-two years of incarceration. Anderson makes four arguments on appeal. First, Anderson contends that the trial court erred when it denied his motion to sever his case from that of co-defendants Eric Lloyd and Dwayne White. Second, Anderson argues that the trial court should not have admitted gun evidence seized from a co-defendant's apartment. Third, Anderson contends that the trial court erred by denying his motions to suppress evidence discovered following search warrants for his home, car, and cell phones. And finally, Anderson contends that the trial court erred in denying his motion for judgment of acquittal on two charges. For the reasons discussed below, we find Anderson's claims are without merit and affirm the judgment of the Superior Court.

## I.

This Court has already affirmed the convictions of Anderson's co-defendants Dwayne White and Eric Lloyd, who were tried with Anderson.[1] We incorporate the

---

[1] *White v. State*, 243 A.3d 381 (Del. 2020); *Lloyd v. State*, --- A.3d ----, 2021 WL 1163917 (Del. Mar. 26, 2021).

2

factual background in those opinions and focus on the facts pertinent to Anderson's conviction and arguments on appeal.

## A.

Viewing the evidence at trial in a light most favorable to the State,[2] Damon Anderson, who goes by the nickname "Frog," was a drug dealer in a sprawling Wilmington cocaine and heroin distribution enterprise. Eric Lloyd and Dwayne White ran the operation. Anderson worked closely with White as a high-level drug dealer in the enterprise.[3] He had an "open door policy" with White to get drugs on an as-needed basis.[4] Whenever White was facing scrutiny by the police and needed to lay low, Anderson became the supplier in White's place.[5] Anderson was "part of . . . the inner circle" of drug dealers that orbited White.[6]

Lloyd headed the cocaine trade and White was at the top of the heroin trade.[7] Lloyd and White frequently called upon enterprise members like Anderson to gamble at casinos and to place sports bets as a way to "wash" drug proceeds.[8] In

---

[2] *Monroe v. State*, 652 A.2d 560, 563 (Del. 1995) ("The standard of review in assessing an insufficiency of evidence claim is 'whether any rational trier of fact, viewing the evidence in the light most favorable to the State, could find [a] defendant guilty beyond a reasonable doubt.'") (quoting *Robertson v. State*, 596 A.2d 1345, 1355 (Del. 1991)).

[3] App. to Opening Br. at A983-85 (Testimony of Tyrone Roane).

[4] *Id.* at A984.

[5] *Id.* ("[W]hen Dwayne White started getting hot by the police . . . he had to go under the radar and at that particular time, Damon Anderson, he took over. He became the legs for him . . . .").

[6] *Id.* at A1400 (Testimony of Dante Sykes).

[7] *Id*. at A1389.

[8] *Id.* at A1002 (Testimony of Tyrone Roane) (describing the purpose of gambling within the enterprise as a way to "clean our money up"); *id.* at A1395-96 (Testimony of Dante Sykes) (noting that gambling was "an easy way to wash the money out").

addition to laundering proceeds through gambling, Lloyd, White and Anderson concealed physical assets and proceeds through investment properties and LLCs. The scheme involved creating LLCs to purchase real estate, only to quickly transfer the title to a friend or family member at no cost.[9]

After Anderson's arrest, the police executed a search warrant for Anderson's residence and car. Investigators recovered seven cell phones, drug packaging materials, gambling receipts, money order receipts, a $550 t-shirt, $750 sneakers, and another pair of sneakers worth $1,000.[10] Police also recovered Anderson's 2016 W-2 and tax return forms, which showed that he earned $16,156 that year.[11] Finally, police discovered documents showing that Anderson had an ownership interest in a cleaning franchise with a fellow enterprise member.[12]

The quantity and type of cell phones recovered were indicative of Anderson's role in the enterprise. Anderson had several flip phones, or "burner" phones, as they are commonly referred to by investigators.[13] Drug dealers use multiple burner phones at once for different clientele or for different drugs and only use them for a short period of time to evade detection by law enforcement.[14] Investigators also

---

[9] *Id.* at A1512 (Testimony of Michelle Hoffman).
[10] *Id.* at A793 (Testimony of Det. Barnes).
[11] *Id.* at A796.
[12] *Id.* at A794-95.
[13] *Id.* at A817, A1449 (Testimony of Det. Barnes).
[14] *Id.* at A1449.

recovered a phone they knew belonged to Anderson based on wiretap evidence.[15] Through the wiretap, police listened to calls where White told Anderson to make bets in a boxing match exceeding $20,000.[16] A search warrant for the content of the phones revealed text messages about drug transactions.[17] Police also recovered "drug ledgers" with the names of enterprise members and the amount of money each individual owed White based on the drugs he gave them to sell.[18] At least two ledgers referred to Anderson by his nickname, Frog.[19] One ledger listed "8,000" next to "Frog."[20]

## B.

On October 16, 2017, a New Castle County grand jury indicted Anderson and thirty-three co-defendants for Criminal Racketeering and other charges associated with Lloyd and White's illegal drug enterprise. A series of superseding indictments modified the charges against Anderson and his co-defendants. Eventually, the State charged Anderson with Conspiracy to Commit Criminal Racketeering, Drug Dealing Heroin, Aggravated Possession of Heroin, Drug Dealing Cocaine, Money Laundering, Conspiracy to Commit Money Laundering, and Attempt to Evade or Defeat Tax.

---

[15] *Id.* at A811-12, A817.
[16] *Id.* at A1485 (Testimony of Special Agent Haney).
[17] *Id.* at A1452 (Testimony of Det. Barnes).
[18] *Id.* at A702.
[19] *Id.* at A705, A708.
[20] *Id.* at A705.

Before trial, it became known that White planned to admit to the Drug Dealing, Conspiracy to Commit Drug Dealing, and Criminal Racketeering charges against him but deny involvement in the shooting of a six-year-old child. Lloyd and Anderson sought to sever their trials from White's trial. The Superior Court denied the request. Anderson, Lloyd and White proceeded to trial in the Superior Court. At the close of the State's case, Anderson moved for judgment of acquittal on the Money Laundering and Attempt to Evade or Defeat Tax charges. The court denied the motion. After a nine-day trial, a jury convicted Anderson of Conspiracy to Commit Criminal Racketeering, two counts of Drug Dealing (Tier 4), Money Laundering, and Attempting to Evade or Defeat Tax. Anderson was found not guilty of Aggravated Possession of Heroin. The State dismissed the Conspiracy to Commit Money Laundering charge. On October 18, 2019, the Superior Court declared Anderson an habitual offender and sentenced him to an aggregate thirty-two years of incarceration at descending levels of supervision. This is Anderson's direct appeal.

## II.

### A.

First, Anderson challenges the Superior Court's denial of his motion to sever his trial from his co-defendants. As we explained in *Lloyd*, under Superior Court Criminal Rule 8(a), a defendant may be indicted for two or more offenses if the

6

offenses are "of the same or similar character or are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan."[21] Superior Court Criminal Rule 8(b) permits joinder of defendants in the same indictment "if they are alleged to have participated in the same act or transaction or in the same series of acts or transaction constituting an offense or offenses."[22] Rule 14, however, allows the Superior Court to grant separate trials "[i]f it appears that a defendant or the state is prejudiced by a joinder of offenses or of defendants in an indictment or information or by such joinder for trial."[23] "Ordinarily, defendants indicted jointly should be tried together; but if justice requires it, the trial court should grant separate trials."[24] The defendant bears the burden of establishing more than "mere hypothetical prejudice."[25]

When reviewing a motion to sever, the trial court should consider as appropriate "(1) problems involving a co-defendant's extra-judicial statements; (2) an absence of substantial independent competent evidence of the movant's guilt; (3) antagonistic defenses as between the co-defendant and the movant; and (4) difficulty in segregating the State's evidence as between the co-defendant and the movant."[26]

---

[21] Super. Ct. Crim. R. 8(a).
[22] Super. Ct. Crim. R. 8(b).
[23] Super. Ct. Crim. R. 14.
[24] *Skinner v. State*, 575 A.2d 1108, 1119 (Del. 1990) (citing *Jenkins v. State*, 230 A.2d. 262, 272 (Del. 1967)).
[25] *Bates v. State*, 386 A.2d 1139, 1141 (Del. 1978).
[26] *Floudiotis v. State*, 726 A.2d 1196, 1210 (Del. 1999) (citing *Manley v. State*, 709 A.2d 643, 652 (Del. 1998)). *See Jenkins*, 230 A.2d at 273.

7

On appeal, we review a trial court's decision on a motion to sever for abuse of discretion.[27] The denial of a motion to sever will not be set aside "unless [the] defendant demonstrates a 'reasonable probability' that the joint trial caused 'substantial injustice.'"[28]

As noted earlier, Anderson and Lloyd learned before trial that White planned to admit to the racketeering and drug dealing charges at trial. Lloyd filed a motion to sever, which Anderson joined.[29] Anderson and Lloyd argued that White's admission to involvement in the enterprise rendered the co-defendants' defenses mutually antagonistic.[30] The court denied the motion, and found that White's admission to drug dealing would not "create such a serious risk[,] or is so antagonistic" that the jury would have to conclude that White was part of an enterprise that involved Anderson or Lloyd.[31] The court also instructed the jury that

---

[27] *Phillips v. State*, 154 A.3d 1146, 1156 (Del. 2017) (citing *Winer v. State*, 950 A.2d 642, 648 (Del. 2008)).

[28] *Id.* (alteration in original) (internal quotation marks omitted) (quoting *Walker v. State*, 790 A.2d 477, 2002 WL 122643, at *1 (Del. 2002) (TABLE)); Super. Ct. Crim. R. 8(a); 14.

[29] App. to Opening Br. at A234-241, A1648-51. Lloyd filed his first motion to sever on March 19, 2019. *Id.* at A1635-45. Anderson did not join Lloyd's first motion to sever. The court denied the motion.

[30] *Id.* at A254 ("[Anderson's Counsel:] The two of us as counsel [are] going to be arguing against each other as to [whether an enterprise] did or didn't exist and then we are going to argue against [Tyrone] Roane's statement because one of us is going to want to have him believed and the other is not.").

[31] *Id.* at A260-62 (citing *Zafiro v. United States*, 506 U.S. 534, 539 (1993) ("[W]hen defendants properly have been joined under Rule 8(b), a district court should grant severance . . . only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence.")).

each defendant was charged with a separate offense and should be evaluated independently.[32]

On appeal, Anderson argues that Superior Court should have granted his severance motion because "there was a reasonable probability that substantial prejudice would result from joinder."[33] He contends that the four-factor analysis for review of a motion to sever weighed heavily in favor of severance. After reviewing those factors, however, we find that the Superior Court did not abuse its discretion when it denied Anderson's severance motion.

The first factor—problems involving a co-defendant's extra-judicial statements—did not weigh in favor of severance. Anderson points to a single statement when a witness, Dante Sykes, recalled speaking with White while he was waiting on Anderson to deliver heroin to Seaford:

> The State:   Did you ever deal directly with Frog [Anderson] yourself?
>
> Sykes:   Yeah, dealing with Bop [sic] [White] with the dope, at times specifically, he was waiting on the dope to get to send it down [to] Seaford, and he calling waiting for Frog to come with it . . . waiting on Frog, he was taking long.[34]

In *Jenkins v. State*,[35] this Court held that the trial court should have severed the defendants when trying the co-defendants "together was, in effect, to try each

---

[32] *Id.* at A261.
[33] Opening Br. at 13.
[34] App. to Opening Br. at A1391 (Testimony of Dante Sykes).
[35] 230 A.2d 262 (Del. 1967).

upon the extra-judicial statement of the other."[36]  Here, unlike in *Jenkins*, Sykes' reference to White "waiting on Frog" was not an extra-judicial statement from White.  Anderson also concedes that Sykes' reference to Anderson in this context was "somewhat innocuous."[37]  Regardless, the State presented substantial evidence of Anderson's involvement in the enterprise independent of Sykes' one reference to Anderson.

Anderson argues that the second factor—lack of independent competent evidence of Anderson's guilt—weighed in favor of severance because the State failed to present independent evidence that he was guilty of drug dealing, money laundering, or tax fraud.  According to Anderson, being tried alongside Lloyd and White, for whom the State had "overwhelming evidence" to support convictions, "cast overtones" that Anderson's affiliation to the enterprise was more significant than it actually was.[38]

The trial record, however, shows substantial independent evidence of Anderson's involvement in the crimes charged.  The drug dealing charge was supported by testimony from multiple admitted enterprise members who stated that Anderson was a high-ranking dealer in the enterprise and that they received drugs

---

[36] *Id.* at 273.
[37] Opening Br. at 15.
[38] *Id.* at 16.

from Anderson on White's behalf.[39] Anderson's name also appeared on two ledgers recovered from White's apartment that listed drug dealers with outstanding balances for drugs that White had given them to distribute.[40] Further, during a search of Anderson's home, investigators found drug packaging materials and burner phones with text messages about drug transactions.[41]

The State's evidence also supported the money laundering and tax fraud charges. Several witnesses testified that enterprise members used gambling and sports betting to launder illegal drug proceeds. A wiretap of White's phone revealed that Anderson made a $20,000 bet for White on a boxing match in Vegas.[42] Investigators found dozens of betting receipts and money order receipts in Anderson's home.[43] And finally, the designer clothes worth thousands of dollars recovered from Anderson's home were incongruent with Anderson's 2016 tax documents showing he made $16,156 that year.[44] Thus, the second factor did not weigh in favor of severance.

---

[39] App. to Opening Br. at A1400 (Testimony of Dante Sykes) (noting that Anderson "used to be a big part of . . . the inner circle"); *see also id.* at A983-84 (Testimony of Tyrone Roane) (describing that Anderson dealt drugs for White, and that Anderson occasionally distributed drugs to other dealers on behalf of White when the police were getting "hot" on White); *id.* at A989 (explaining that Anderson was part of an exclusive group of enterprise members who had access to an apartment White and Lloyd used to relax).

[40] *Id.* at A705, A708 (Testimony of Det. Barnes) (reciting Anderson's nickname, "Frog," from a list of names on a drug ledger recovered from White's home).

[41] *Id.* at A1449-52 (Testimony of Det. Barnes).

[42] *Id.* at A1485 (Testimony of Special Agent Haney).

[43] *Id.* at A793 (Testimony of Det. Barnes).

[44] *Id.* at A796.

The third factor asks whether there were antagonistic defenses between the co-defendant and the movant. Anderson contends that because White admitted to the drug dealing, money laundering, and tax charges, the jury would similarly conclude that Anderson was guilty by association. But "the presence of hostility between a defendant and his codefendant or 'mere inconsistencies in defenses or trial strategies' do not require a severance."[45] As we held in *Lloyd*, White's concessions did not create a situation where the jury could reasonably accept the core of the defense offered by either defendant only if it rejected the core defense offered by his co-defendant.[46] We agree with the Superior Court that the jury could have reviewed Anderson's guilt independent of the illegal activities of White or Lloyd.[47] Thus, the third factor did not weigh in favor of severance.

Finally, under the fourth factor the court considers the difficulty in segregating the State's evidence between the co-defendant and the movant. Anderson contends that "the tone of the trial" made it difficult for the jury to segregate "the stronger evidence against Lloyd and White from the lesser evidence that may have implicated Anderson."[48] According to Anderson, the evidence the State introduced as support

---

[45] *Phillips*, 154 A.3d at 1157 (quoting *Outten v. State*, 650 A.2d 1291, 1298 (Del. 1994)).
[46] *Lloyd*, 2021 WL 1163917, at *7.
[47] App. to Opening Br. at A260-62.
[48] Opening Br. at 18-19.

for the attempted murder charge "paint[ed] a picture that [] Anderson was responsible through the enterprise for these acts."[49]

The Superior Court, however, took steps to address the separateness of the charges and the defendants through the following jury instruction:

> The defendants are each charged with separate offenses that are set forth in the indictment. These are each separate and distinct offenses, and you must independently evaluate each offense. The fact that you reach a conclusion with respect to one offense, or with regard to one defendant, does not mean that the same conclusion will apply to any other charged offense or to any other charged defendant. Each charge before you is separate and distinct, and you must evaluate evidence as to one offense independently from evidence of each other offense and render a verdict as to each individually.[50]

"Juries are presumed to follow the court's instructions."[51] The jury appears to have done so here. The jury found all three co-defendants guilty of some charges and not guilty on others. This suggests that the jury understood the above instruction and assessed each defendant's charges with due care. Thus, the fourth factor did not weigh in favor of severance. Having found that none of the factors weighed in favor of severance, the Superior Court did not abuse its discretion by denying the motion to sever.

---

[49] *Id.* at 19.
[50] App. to Opening Br. at A1597.
[51] *Phillips*, 154 A.3d at 1157.

## B.

The Superior Court admitted into evidence guns seized from the apartment and storage unit of another co-defendant, Maurice Cooper. The court found that the gun evidence was relevant and went to the State's showing of the existence of an enterprise.[52] Anderson argues on appeal that "[t]here [was] absolutely no nexus between [] Anderson and [] Cooper nor the firearms."[53] The guns should not have been admitted, Anderson claims, because they were irrelevant and the evidence "inflamed the jury."[54] We review the Superior Court's decision to admit or exclude evidence for abuse of discretion.[55]

Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable"[56] and is admissible unless otherwise provided by statue or rule.[57] Relevant evidence may be excluded "if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."[58]

---

[52] App. to Answering Br. at B5.
[53] Opening Br. at 21.
[54] *Id.*
[55] *Wright v. State*, 25 A.3d 747, 752 (Del. 2011).
[56] D.R.E. 401.
[57] D.R.E. 402.
[58] D.R.E. 403.

The guns were found in the possession of an enterprise member with a large quantity of heroin.[59] As we held in *Lloyd*, the guns and drugs were part of the enterprise's drug dealing operation, and relevant to establish the existence of the enterprise and its business operations.[60] Cooper was part of the enterprise.[61] Accordingly, the court did not abuse its discretion by admitting the guns found in Cooper's possession.

## C.

We turn next to the Superior Court's denial of Anderson's suppression motions. This Court generally reviews a trial court's denial of a motion to suppress for abuse of discretion.[62] "We review the trial judge's factual findings to determine whether there was sufficient evidence to support the findings and whether those findings were clearly erroneous. To the extent that we examine the trial judge's legal conclusions, we review them *de novo* for errors in formulating or applying legal precepts."[63] Appellate review of a challenge to a search warrant must "examine the affidavit to ensure that there was a substantial basis that probable cause existed."[64] "We conduct a *de novo* review to determine whether the totality of the

---

[59] App. to Answering Br. at B8.
[60] *Lloyd*, 2021 WL 1163917, at *9.
[61] App. to Opening Br. at A1411 (Testimony of Dante Sykes) (stating that Maurice Cooper was part of the "crew").
[62] *Smith v. State*, 887 A.2d 470, 472 (Del. 2005).
[63] *West v. State*, 143 A.3d 712, 715 (Del. 2016) (citations omitted) (citing *Lopez-Vazquez v. State*, 956 A.2d 1280, 1284-85 (Del. 2008)).
[64] *Sisson v. State*, 903 A.2d 288, 296 (Del. 2006).

circumstances, in light of the trial judge's factual findings, support a reasonable and articulable suspicion for the [search]."[65]

"Under the Delaware and the United States constitutions, 'a search warrant may be issued only upon a showing of probable cause.'"[66] "[A]ny finding of probable cause must be based on the information that appears within the four corners of the application or affidavit."[67] "[A] magistrate may find probable cause when, considering the totality of the circumstances, 'there is a fair probability that contraband or evidence of a crime will be found in a particular place.'"[68] This Court has held that "[a] determination of probable cause by the issuing magistrate will be paid great deference by a reviewing court and will not be invalidated by a hypertechnical, rather than a common sense, interpretation of the warrant affidavit."[69]

i.

Before trial, Anderson moved to suppress evidence seized from his residence and car, arguing that the affidavit in support of the search warrant failed to set forth

---

[65] *Lopez-Vazquez*, 956 A.2d at 1285.

[66] *Sisson*, 903 A.2d at 296 (citing *Fink v. State*, 817 A.2d 781, 786 (Del. 2003); U.S. Const. Amend. IV, Del. Const. art. 1, § 6.).

[67] *Valentine v. State*, 207 A.3d 566, 570 (Del. 2019) (citing *State v. Holden*, 60 A.3d 1110, 1114 (Del. 2013); *Dorsey v. State*, 761 A.2d 807, 811 (Del. 2000)).

[68] *Sisson*, 903 A.2d at 296 (quoting *Stones v. State*, 676 A.2d 907, 1996 WL 145775, at *2 (Del. Feb. 23, 1996)).

[69] *Jensen v. State*, 482 A.2d 105, 111 (Del. 1984) (citing *United States v. Ventresca*, 380 U.S. 102, 109 (1965)).

specific facts sufficient to establish probable cause and a logical nexus between the items sought and the place to be searched. The warrant application stated that the officers sought to collect from Anderson's home or car: a cell phone known to be affiliated with Anderson based on wiretap investigations, drugs or drug paraphernalia, United States currency, business records indicative of drug transactions, and firearms or ammunition.[70] Based on the court's review of the affidavit, the court determined there was sufficient information for the Magistrate to find probable cause. The court also found that "the nexus facts [were] sufficiently set forth in Paragraph 8," which recounted the execution of the Rule 9 warrant and Anderson's arrest at 17 Oakley Court.[71]

On appeal, Anderson contends that the motion to suppress should have been granted because the affidavit in support of the search warrant for his residence and car lacked facts sufficient to demonstrate probable cause that a crime had been committed. Anderson's main issue is with uncorroborated information from an informant. Anderson claims that there was "no independent observation" of Anderson conducting any drug transactions or possessing any drugs in either his home or car. Accordingly, Anderson contends that there were no facts set forth in

---

[70] App. to Opening Br. at A93.
[71] *Id.* at A148.

the affidavit of probable cause that are sufficient to demonstrate a nexus between Anderson's home and car and the enterprise.

We find, however, that the Superior Court correctly found that the affidavit set forth facts sufficient to establish probable cause and a logical nexus between the items sought and Anderson's home and car. In the affidavit Detective Barnes stated that:

- Anderson was present at White's stash house and was observed leaving with White carrying a large bag.

- White and Anderson met with William Wisher that day, and Wisher was arrested four days later with 13,000 bags of heroin.

- At least four past, proven, and reliable confidential informants advised police that White and Anderson were members of a drug dealing enterprise.

- Enterprise members were known to launder drug proceeds by gambling at casinos.

- On one occasion, police intercepted a phone call between White and Anderson while Anderson was in Las Vegas in which White asked Anderson to place a large wager on a sporting event for him.

- Anderson was recently indicted for Conspiracy to Commit Criminal Racketeering.

- Anderson had an extensive criminal history, including six adult felony convictions and was a person prohibited from possessing a firearm.[72]

The facts set forth in the affidavit established Anderson's close proximity and involvement with individuals participating in the drug dealing enterprise. Anderson had just been indicted for racketeering offenses involving drug dealing. It is reasonable to infer from his interactions with other enterprise members that Anderson was involved in drug dealing. The places to be searched also had a nexus to the crimes. Investigators were told that Anderson was staying at 17 Oakley Court with his girlfriend. Anderson was present at that address when officers arrived to arrest him under the Rule 9 warrant. The affidavit further described how detectives knew based on wiretap information that Anderson was in possession of a cell phone used to communicate with White about suspected enterprise business. The Magistrate could reasonably infer from Anderson's involvement with the enterprise that his cell phone and enterprise-related evidence would likely be present at his house and in his car. Accordingly, the Superior Court did not abuse its discretion in denying Anderson's first motion to suppress.

ii.

Anderson also moved to suppress evidence discovered in the contents of seven cell phones recovered by police during the search of his residence and car. The

---

[72] *Id*. at A94-96.

19

affidavit of probable cause for this warrant added four new paragraphs but was otherwise identical to the first warrant application for Anderson's home and car.[73] The additional paragraphs described the items collected from Anderson's home and car, including the seven cell phones, drug packaging materials, designer clothes, and Anderson's 2016 tax documents.[74] The affidavit stated that one of the phones recovered from Anderson's home was used to contact White.[75]

The Superior Court concluded that "the issuance of the search warrant was proper because it was supported by probable cause."[76] According to the court, "the affidavit provided a detailed account of the investigation thus far, which implicated [Anderson] at almost every turn.[77] Further, the Superior Court found that the warrant

---

[73] *Id.* at A124-26.
[74] *Id.*
[75] *Id.* at A125 ("Located in [Anderson's] property were seven (7) cellular phones, to include the phone used to contact [White] with phone number 302-887-0083.").
[76] *State v. Anderson*, 2018 WL 6177176, at *3 (Del. Super. Nov. 5, 2018).
[77] *Id.* The Superior Court concluded that:

> Police sufficiently documented the investigation into the criminal enterprise in which [Anderson] allegedly engaged. [Anderson] was seen with Dwayne White at White's stash location, and later with William Wisher a few days before Wisher was arrested and 13,000 bags of heroin were seized from Wisher's house. Further, White contacted [Anderson] via cell phone which was later seized by police. White allegedly asked [Anderson] to engage in conduct which a court may reasonably infer—when viewed in a totality of the circumstances—was intended to launder money for the criminal organization. Lastly, and importantly, a grand jury had indicted [Anderson] just prior to the search warrant's issuance. This was stated in the search warrant application. "Racketeering" by its definition, is an ongoing enterprise.

> *Id.* at *3.

20

satisfied the particularity requirement. And the court limited the State's use of evidence from the phones to the period when the alleged criminal activity occurred.[78]

On appeal, Anderson argues that "the only additional information included in [the] warrant . . . [was] that there was one phone intercept of Anderson speaking to White."[79] In the intercepted conversation, White asked Anderson to place bets on a boxing match while Anderson was in Vegas. Anderson claims this fact alone is insufficient to demonstrate probable cause.

Anderson relies on the Superior Court's decision in *State v. Westcott*.[80] In *Westcott*, police sought to obtain a search warrant for the contents of three cell phones to secure evidence relating to murder, robbery, and drug dealing charges against the defendant. The affidavit in support of the warrant stated that the phones were found with drugs during a consent search of the apartment where Westcott was staying. Accordingly, "the detective sought to search 'the three phones to look for physical evidence or confession of the shooting or the illegal distribution of heroin contained therein.'"[81] In his motion to suppress, Westcott argued that the search warrant affidavit failed to support probable cause because the detective did not state a logical nexus between the mobile phones and the crime. The Superior Court

---

[78] *Id.*
[79] *Id.* at 25.
[80] 2017 WL 283390 (Del. Super. Jan. 23, 2017).
[81] *Westcott*, 2017 WL 283390, at *1.

agreed, and reasoned that "[m]issing in the State's probable-cause analysis, however, is a logical nexus between Mr. Westcott's ownership of the phone and the existence of digital evidence of the crimes on that phone" and "[t]he mere fact that a defendant owns a mobile phone is not, in and of itself, sufficient to warrant an inference that the evidence of any crime he or she commits may be found on that mobile phone."[82]

*Westcott* is distinguishable from the facts of this case. Westcott was not charged with racketeering. Rather, police were investigating Westcott for murder and robbery charges and a drug charge. There, the warrant sought to search all three phones for a possible confession from Westcott or for evidence of drug dealing when there were at least two other people also living in the apartment. Here, as we have discussed, the State was required to establish the existence of the criminal enterprise, its criminal purpose—drug dealing—and Anderson's affiliation with the enterprise and his actions taken in furtherance of the enterprise. In his affidavit of probable cause, the detective showed Anderson's association with White and with the larger enterprise.[83] He explained that one of the phones recovered from Anderson's property was used to make calls to White about sports betting, which was an act to

---

[82] *Id.*

[83] *See Starkey v. State*, 74 A.3d 655 (Table), 2013 WL 4858988, at *3 (Del. Sept. 10, 2013) (quoting *Jones v. State*, 28 A.3d 1046, 1057 (Del. 2011)) ("[P]ersons involved in criminal acts will utilize Mobile Electronic Devices such as cellular telephones to further facilitate their criminal acts and/or communicate with co-conspirators.").

launder money in furtherance of the enterprise.[84]  And the detective explained the significance of Anderson owning seven phones—"[c]riminals and drug traffickers routinely change phones and phone numbers and often maintain one if not several cellphones at the same time in an effort to stifle and/or avoid any law enforcement attempts to intercept their communications."[85]  Thus, the Superior Court did not abuse its discretion by denying in part Anderson's motion to suppress the contents of the seven cell phones.

D.

On June 13, 2019, Anderson moved for judgment of acquittal on the Money Laundering and Attempt to Evade or Defeat Tax charges.  The Superior Court denied the motions, finding that the State had introduced sufficient evidence to support the charges.[86]

On appeal, Anderson argues that the Superior Court erred because the State's evidence against him was insufficient, and he reiterates his argument that his joinder with Lloyd and White was unfairly prejudicial.  Regarding the money laundering and tax fraud charges, Anderson asserts that the 2016 tax documents established that he had a legitimate source of income.  He claims the value of the betting receipts were not "excessive" enough to be considered "unsubstantiated income."  Further,

---

[84] App. to Opening Br. at A125.
[85] *Id.* at A126.
[86] *Id.* at A1526.

Anderson argues that the State did not present any evidence to show that his interest in the cleaning franchise was illegitimate. This Court "review[s] the denial of a Motion for Judgment of Acquittal *de novo* to determine whether any rational finder of fact, viewing the evidence in the light most favorable to the State, could find the defendant guilty beyond a reasonable doubt."[87]

We agree with the Superior Court that, viewing the evidence in the light most favorable to the State, the evidence introduced against Anderson on the money laundering and tax fraud charges was sufficient to support a conviction. "Though much of the evidence was primarily circumstantial, this Court does not require direct evidence to sustain a verdict."[88] The State presented evidence that Anderson took expensive vacations and spent money on designer clothes despite having a reported income of $16,156. While the State did not go into detail about Anderson's interest in the cleaning franchise, enterprise member Dante Sykes testified that enterprise leadership often used investment properties and LLCs to conceal drug proceeds. Sykes further testified that Anderson concealed proceeds and assets through gambling and sports betting.[89] Detective Barnes explained that drug dealers often use legal gambling to "legitimize" income from drug sales.[90] Investigators found

---

[87] *Hoennicke v. State*, 13 A.3d 744, 748 (Del. 2010) (citing *Gibson v. State*, 981 A.2d 554, 557 (Del. 2009)).
[88] *Id.* (citing *Robertson v. State*, 596 A.2d 1345, 1355 (Del. 1991)).
[89] App. to Opening Br. at A1395-96 (Testimony of Dante Sykes).
[90] *Id.* at A807 (Testimony of Det. Barnes).

dozens of betting receipts in Anderson's home. Special Agent Sean Haney testified that police intercepted a phone call between White and Anderson in which White asked Anderson to place a large bet on a boxing match for him while Anderson was in Las Vegas.[91] Taken together, the State's evidence is sufficient to support a conviction for Money Laundering and Attempt to Evade or Defeat Tax.

Finally, Anderson raises for the first time on appeal that there was no credible evidence to support the Drug Dealing Heroin charge. "In the absence of a motion for directed verdict or judgment of acquittal notwithstanding the verdict, this Court reviews claims of insufficient evidence for plain error."[92] Anderson does not develop his argument beyond "the jury heard much testimony regarding co-Defendants Lloyd and White, not so much with Anderson."[93] Thus, Anderson's claim that there was no credible evidence to support the Drug Dealing Heroin charge fails. Accordingly, the Superior Court did not err in denying Anderson's motions for judgment of acquittal, nor did the court err in finding that there was sufficient evidence to support the drug dealing charge.

## III.

The judgment of the Superior Court is affirmed.

---

[91] *Id.* at A1485 (Testimony of Special Agent Haney).
[92] *Swan v. State*, 820 A.2d 342, 358 (Del. 2003) (citing *Monroe v. State*, 652 A.2d 560, 563 (Del. 1995)).
[93] Opening Br. at 27-28.