# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| STATE OF DELAWARE, | ) | |
| | ) | |
| v. | ) | Case No.: 2203016715 |
| | ) | |
| JARROD PENN, | ) | |
| | ) | |
| Defendant. | ) | |

*Submitted: April 26, 2023*
*Decided: May 1, 2023*

## OPINION AND ORDER

*Upon Consideration of Defendant's Motion to Suppress Evidence:*
**DENIED.**

Jillian Schroeder, Deputy Attorney General, of the DELAWARE DEPARTMENT OF JUSTICE, Wilmington, Delaware, for the State of Delaware.

Andrew Witherell, *Esquire*, of the WITHERELL LAW FIRM, Wilmington, Delaware, for Jarrod Penn.

**JONES, J.**

## INTRODUCTION

A New Castle County Grand Jury indicted Defendant Jarrod Penn for Drug Dealing, Possession of a Firearm During the Commission of a Felony, Possession of a Firearm by a Person Prohibited, Possession or Control of Ammunition by a Person Prohibited, Carrying a Concealed Deadly Weapon, and Resisting Arrest. This case centers on drugs and a handgun seized from Mr. Penn on March 31, 2022.

Mr. Penn filed a motion to suppress, which the Court took under advisement after an evidentiary hearing on April 14, 2023 and the additional briefing that followed.[1] For the reasons stated herein, the motion is **DENIED**.

## FACTUAL OVERVIEW

The Court finds the State has proven the following facts by a preponderance of the evidence.[2]

Sergeant Deshaun Ketler, a member of the Wilmington Police Department Street Crimes Unit, investigates crimes involving guns and drugs.[3] Sergeant Ketler has extensive training for his work.[4] On March 31, 2022, Sergeant Ketler was on patrol in an unmarked car in the area of Cityview Avenue and 30th Street in Wilmington, Delaware.[5]

---

[1] Mr. Penn filed his additional briefing on April 23, 2023, and the State filed its additional briefing on April 26, 2023.

[2] *State v. Holmes*, 2022 WL 4353455, at *3 (Del. Super. Sept. 9, 2022) ("On a defendant's motion to suppress evidence that was obtained without a warrant, the State must substantiate the propriety of the challenged intrusion by a preponderance of the evidence.").

[3] Supp. Hr'g. Tr. (Apr. 14, 2023) at 18:12-16; 20:1-5.

[4] *Id.* at 20:18-23; 21:1-23; 22:1-23; 23:1-23; 24:1-4.

[5] *Id.* at 25:1-4.

Sergeant Ketler was traveling down 30th Street towards Pine Street Park.[6] At that time, the Street Crime Unit, which Sergeant Ketler supervised, was conducting a traffic stop.[7] Police were initially present because the region was well-known as a high-crime and high-drug area.[8] Sergeant Ketler was *en route* to assist with the vehicle stop down the street.[9]

As Sergeant Ketler traveled towards the stop, a pedestrian wearing a puffy jacket (later identified as Mr. Penn) crossed the street in front of him without using a crosswalk.[10] Sergeant Ketler noticed that the right side of Mr. Penn's jacket hung significantly lower than the left side, as if a heavy object were weighing it down.[11] Mr. Penn's "main focus" appeared to be on the unrelated Pine Street Park traffic stop[12] and he failed to notice Sergeant Ketler's presence.[13] Based on his eyewitness observations coupled with his training and experience, Sergeant Ketler strongly suspected Mr. Penn was carrying a handgun in his right pocket.[14]

Abandoning his prior task, Sergeant Ketler decided to continue investigating Mr. Penn.[15] He drove past the traffic stop, turned around on 28th Street, and stopped outside of Pine Street Park.[16] There, Sergeant Ketler observed Mr. Penn, now in the park, sit on

---

[6] *Id.* at 25:22-23.
[7] *Id.* at 25:8-9.
[8] *Id.* at 20:15-17.
[9] *Id.* at 27:9-10.
[10] *Id.* at 27:17-20.
[11] *Id.* at 28:1-5.
[12] *Id.* at 28:13-15.
[13] *Id.* at 28:22-23.
[14] *Id.*
[15] *Id.*
[16] *Id.* at 29:11-18.

a bench.[17] Mr. Penn appeared nervous and continued to monitor the traffic stop from his seat[18] before standing up, sitting back down, and then exiting the park after a couple of minutes.[19]

Sergeant Ketler followed Mr. Penn back to East 30th Street, where Mr. Penn stood on the steps between the residences located at 31 and 33 East 30th Street.[20] Mr. Penn continued his focus on the traffic stop and, after a few seconds, came back onto the sidewalk in front of the residences to get a better look down the street.[21] As Mr. Penn stood on the sidewalk, Sergeant Ketler approached him and asked if they could speak.[22]

Upon approach, a startled Mr. Penn asked Sergeant Ketler "Why are you messing with me?"[23] to which Sergeant Ketler replied "[Because] I believe you have a firearm."[24] Mr. Penn, again, asked why Sergeant Ketler was "fucking with him," and raised his right hand towards his pocket.[25] Sergeant Ketler took this to mean Mr. Penn was subconsciously checking his pocket for the handgun and ordered Mr. Penn to keep his hands at his side.[26]

---

[17] *Id.* at 29:17-28.
[18] *Id.* at 32:22-23.
[19] *Id.* at 33:1-3. Mr. Penn notes the inconsistency between Sergeant Ketler's police report and his testimony at the suppression hearing. In his police report, Sergeant Ketler claimed Mr. Penn only stood in the park and made no mention of Mr. Penn sitting on a bench. But at the hearing, Sergeant Ketler testified that Mr. Penn sat down on the bench before standing up. In the Court's view, this discrepancy between report and testimony is harmless, but even if not, the Court finds Ketler's suppression testimony more credible.
[20] *Id.* at 33:10-13.
[21] *Id.* at 36:3-9.
[22] *Id.* at 38:21.
[23] *Id.* at 39:1-2; 40:19.
[24] *Id.* at 41:1.
[25] *Id.* at 41:7-9.
[26] *Id.* at 41:13-21.

Prior to this point, Sergeant Ketler had radioed for backup.[27] Investigators Liro and Akio, who had just disengaged from the traffic stop outside of Pine Street Park, responded to the scene.[28] When Mr. Penn saw the additional officers, he ran.[29] A quick chase ensued.[30] After the officers caught Mr. Penn, Investigator Liro retrieved a loaded handgun out of Mr. Penn's right jacket pocket and a tier weight quantity of crack cocaine, packaged in a way indicative of drug dealing, from his left pocket.[31]

## STANDARD OF REVIEW

Where, as here, the basis for a motion to suppress is a warrantless search, the State bears the burden of proving by a preponderance of the evidence that the challenged search comported with the defendant's constitutional rights.[32]

## ANALYSIS

The question before the Court is whether Sergeant Ketler was justified in stopping Mr. Penn – thereby seizing his person – in the first place. If Sergeant Penn acted without a reasonable and articulable suspicion of criminal activity when he first confronted Mr. Penn, then the "fruits" of that conduct must be suppressed.[33] On the other hand, if Sergeant Ketler acted with a reasonable and articulable suspicion when he confronted Mr. Penn, then the ensuing search was justified.

---

[27] *Id.* at 43:9. At the suppression hearing, Sergeant Ketler testified that he radioed the other officers for backup after Mr. Penn exited the park. In the radio call, Sergeant Ketler warned that he was watching an individual "possibly" armed with a firearm. *Id.* at 33:10-13.
[28] *Id.* at 44:16-18.
[29] *Id.* at 46:9-13.
[30] *Id.* at 45:19-22.
[31] *Id.* at 46:3; 69:13-15.
[32] *State v. Maddrey*, 2020 WL 901490, at *2 (Del. Super. Feb. 25, 2020); *Holmes*, 2022 WL 4353455, at *3.
[33] *Wong Sun v. United States*, 371 U.S. 471, 484 (1963).

## I.    *The Consent*

Briefly, the Court will address the issue of when, exactly, Sergeant Ketler placed Mr. Penn in custody.  At the suppression hearing, Sergeant Ketler testified that he converted a consensual encounter into a seizure when he ordered Mr. Penn to keep his hands by his side.[34]  The Court agrees.

As the Delaware Supreme Court held in *Brown v. State*[35] and *Jones v. State*,[36] under Delaware's more stringent standard, law enforcement officers are permitted to initiate contact with citizens on the street for the purpose of asking questions.[37]  This type of interaction, if consensual, neither amounts to a seizure nor implicates the Fourth Amendment.[38]  During a consensual encounter, a person has no obligation to answer the officer's inquiry and is free to go about his business.[39]  Only when the totality of circumstances demonstrates that the officer's actions would cause a reasonable person to believe he was not free to ignore police presence does a consensual encounter become a seizure.[40]

Sergeant Ketler's actions prior to ordering Mr. Penn to keep his hands by his side were consistent with a consensual encounter.  After he exited his vehicle, Sergeant Ketler asked Mr. Penn if they could speak.  Asking for permission to converse in a public place is, of course, the most basic way a police officer can begin a consensual encounter.

---

[34] Tr. at 67:12-13.
[35] 2011 WL 5319900 (Del. Oct. 31, 2011).
[36] 2011 WL 3890129 (Del. Sept. 2, 2011).
[37] *Brown*, 2011 WL 5319900, at *2 (quotations omitted).
[38] *Id.*
[39] *Id.*
[40] *Id.* (quoting *Jones*, 2011 WL 3890129, at *3).

6

Sergeant Ketler did not tell Mr. Penn to place his hands behind his back, nor did he order Mr. Penn to the ground. In fact, Sergeant Ketler did not use, threaten, or display *any* force when initiating conversation with Mr. Penn.[41]

Further, Mr. Penn's response to Sergeant Ketler suggested a willingness to engage in conversation. Mr. Penn asked Sergeant Ketler why he was "messing with" him.[42] Presumably, because Mr. Penn asked Sergeant Ketler a question, he wanted an answer to it. Had he not wanted to engage in conversation, he easily could have said so.[43] Thus, for purposes of this case, the Court finds Sergeant Ketler initiated the stop when he told Mr. Penn not to put his hand in his pocket.

## II.     The Stop

Sergeant Ketler infringed on Mr. Penn's rights by keeping him from going on his way and ordering him to not put his hand in his pocket. In other words, this is a "stop-and-frisk" case. The fountainhead for "stop-and-frisk" law is *Terry v. Ohio*.[44] According to *Terry* and the legions of cases following it since 1969, "police have the authority to forcibly stop and detain a person if the police have 'a reasonable suspicion' of criminal activity on the part of that person."[45] "'Reasonable suspicion' has been defined as the officer's ability to point to specific and articulable facts which, taken together with the rational inferences from those facts, reasonable warrant th[e] intrusion."[46]

---

[41] Tr. at 39:18-23; 40:1-2.
[42] *Id.* at 39:1-2; 40:19.
[43] Mr. Penn focuses on the fact that Sergeant Ketler did not ask him his name or business. But, as Sergeant Ketler testified, he did not have time to ask Mr. Penn those questions. After Sergeant Ketler answered Mr. Penn's initial question, Mr. Penn fled on foot from police.
[44] 392 U.S. 1 (1968).
[45] *Coleman v. State*, 562 A.2d 1171, 1174 (Del. 1989).
[46] *Id.* (quoting *Terry*, 392 U.S. at 22).

Over the years, the Delaware Supreme Court has refined the standard for deciding what does, and does not, amount to reasonable articulable suspicion justifying a *Terry* stop. Now, Delaware courts must:

> [C]onsider the totality of the circumstances as viewed through the eyes of a reasonable, trained police officer . . . combining objective facts with such an officer's subjective interpretation of those facts.[47]

And as the Supreme Court announced in *Woody v. State*,[48] "[i]n determining whether there was reasonable suspicion to justify a detention, the Court defers to the experience and training of law enforcement officers."[49]

*Terry*'s applicability is clearly established through *Flowers v. State*.[50] *Flowers* concerned a prosecution for drugs and firearm possession, which the police discovered during a brief detention and pat down.[51] At the hearing on the motion to suppress in *Flowers*, Wilmington Police Corporal Thomas Lynch testified that he responded to a call concerning an armed pedestrian at the high-crime intersection of Seventh and West Streets.[52] When Corporal Lynch arrived at the intersection, he observed Mr. Flowers, who "turned his body and grabbed an object that was protruding from his waistband."[53] The object appeared to be rectangular and was "kind of tucked under [Mr. Flowers'] shirt," and Mr. Flowers had his fingers wrapped around the object.[54] Relying on his

---

[47] *Backus v. State*, 845 A.2d 515, 517 (Del. 2004).
[48] 765 A.2d 1257 (Del. 2001).
[49] *Id.* at 1262 (internal citations omitted).
[50] 195 A.3d 18 (Del. 2018).
[51] *Id.* at 22.
[52] *Id.*
[53] *Id.*
[54] *Id.*

training and experience, Corporal Lynch believed Mr. Flowers' actions were consistent with someone attempting to conceal a firearm.[55] After observing Mr. Flowers' actions, Corporal Lynch ordered him to the ground, conducted a pat down of his person, and discovered a handgun.[56]

*Flowers*' holding turns less on the frisk and more on the stop. According to *Flowers*:

> The evidence supports . . . that the officers did not stop Flowers until after they had independent, ample corroboration of [his] suspicious behavior as the officers testified. When he arrived at the scene, Corporal Lynch saw Flowers reach for something in his waistband and wrap his fingers around a rectangular object. . . . [O]nce officers arrived [at the scene], they observed Flowers' conduct which justified the detention and pat down. Moreover, the officers had made other gun arrests that Friday night in Wilmington just blocks from that location. The area was known as a high-crime area. These are all factors properly considered in the reasonable suspicion analysis.[57]

Like this case, *Flowers* involved acts that were subject to a variety of innocent explanations. And like this case, *Flowers* examined *Terry*.[58]

So, similar to Corporal Lynch's suspicions about Flowers, Sergeant Ketler's suspicions of Mr. Penn were raised by behavior that could have been innocent. But just as Corporal Lynch's experience made him suspicious about what he saw, Sergeant Ketler's seventeen years of extensive training and experience made him suspicious about Mr. Penn's clothing and nervous behavior. Based on his experience and what he personally observed, Sergeant Ketler decided to investigate. And, as he watched the

---

[55] *Id.*
[56] *Id.*
[57] *Id.* at 30-31.
[58] *Id.* at 23-24.

events unfold, he became suspicious that Mr. Penn was involved in specific, criminal activity, which culminated in the stop on the sidewalk.

In summary, Sergeant Ketler watched Mr. Penn cross the street without using a crosswalk and immediately observed that Mr. Penn's right coat pocket hung lower than the left, suggesting the presence of a firearm. Sergeant Ketler then saw Mr. Penn nervously monitor an unrelated traffic stop in a high-crime area for a span of ten minutes and engage in suspicious activity while he was in the park area. As Sergeant Ketler observed this behavior, the heavy object weighed down Mr. Penn's right jacket pocket. After leaving the park, Mr. Penn walked to the residences at 31 and 33 East 30th Street and attempted to conceal himself between the houses.[59] Finally, when confronted by Sergeant Ketler, Mr. Penn reached for the object in his pocket after Sergeant Ketler mentioned firearms.

The Court is satisfied that Sergeant Ketler's suspicions were based on his experience, observations, and the inferences drawn from both. This was more than a hunch. This was reasonable suspicion based on articulable facts and rational inferences.

## CONCLUSION

For the foregoing reasons, Mr. Penn's motion to suppress is **DENIED**.

**IT IS SO ORDERED.**

/s/ *Francis J. Jones, Jr.*
Francis J. Jones, Jr., Judge

---

[59] At the suppression hearing, the State argued that Mr. Penn attempted to "blade" himself at the 30th Street residences in an order to hide from the officers. But on cross examination, Sergeant Ketler stated that Mr. Penn bladed in a "neutral position," and when asked if that meant Mr. Penn was "not really doing anything," Sergeant Ketler answered "Right." Tr. at 64:16-23; 65:1. Accordingly, the Court does not find the State's argument regarding blading to be credible and did not consider it in deciding this motion. The Court does, however, find Sergeant Ketler's testimony regarding Mr. Penn's attempts to conceal himself between the residences to be credible.

cc:     Original to Prothonotary (Criminal Division)